**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence Lucky, | No. CV-25-03030-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Wartburg Watch, et al., | |
| Defendants. | |

This is a defamation action.  Plaintiff Lawrence Lucky ("Lucky") alleges that Defendant Todd Wilhelm ("Wilhelm") authored an article on a blog, the Wartburg Watch, that contained a "false and defamatory statement of fact" suggesting that "Lucky engaged in the criminal acts of forgery and/or impersonating a lawyer."  (Doc. 1 ¶¶ 22-23.)  Also named as Defendants are the Wartburg Watch and its "co-founder and/or operator," Darlene Parsons ("Parsons").  (*Id.* ¶¶ 2-3.)[1]

Now pending before the Court are motions to dismiss filed by Wilhelm and Parsons. (Docs. 11, 15.)  The motions are fully briefed (Docs. 18, 19) and no party requested oral argument.  For the reasons that follow, Parsons's motion is granted and Wilhelm's motion is denied.

…

---

[1]   The complaint also named Wanda Martin ("Martin"), co-founder of the Wartburg Watch, as a defendant.  (Doc. 1 ¶ 4.)  On November 10, 2025, Lucky voluntarily dismissed Martin as a defendant.  (Doc. 20.)  The Court will refer to Wilhelm, Parsons, and the Wartburg Watch as "Defendants" in this order.

# BACKGROUND

I.　　Relevant Factual Background

The following facts, presumed true, are taken from the complaint unless otherwise noted.  (Doc. 1.)

### A.　　**The Parties**

"Lucky is an individual and a citizen of the State of Missouri."  (*Id.* ¶ 1.)

"The Wartburg Watch . . . is an unincorporated association that conducts an online presence and, more specifically a 'blog', from the State of North Carolina, has a principal place of business in the State of North Carolina, and is a citizen of the State of North Carolina."  (*Id.* ¶ 2.)

Parsons "is an individual, a citizen of the State of North Carolina, and co-founder and/or operator of Wartburg Watch."  (*Id.* ¶ 3.)

Wilhelm "is an individual, a citizen of the State of Arizona, and a reporter, contributor, and/or author for Wartburg Watch."  (*Id.* ¶ 5.)  "Wilhelm publicly portrays himself as a 'truth teller' who engages in 'research' and 'expos[es] evil' and 'darkness among evangelical elites'."  (*Id.* ¶ 24.)  "His work is described as covering 'many ground breaking stories that others in the mainstream evangelical press were afraid to cover'."  (*Id.*)

### B.　　**Lucky's Tenure At IHOPKC**

"Between 2008 and 2010, Lucky held a paid staff position with the International House of Prayer, Kansas City ('IHOPKC'), related to information technology and music, and also volunteered with youth ministries."  (*Id.* ¶ 14.)  "In February 2010, Lucky voluntarily left IHOPKC to accept new employment as a recording engineer and production manager for a record label."  (*Id.* ¶ 15.)

### C.　　**The Wartburg Watch And Wilhelm's Involvement With The Blog**

"Wartburg Watch's blog purports to offer commentary and news on various religious and social topics."  (*Id.* ¶ 16.)  "Defendants, through Wartberg [sic] Watch, hold themselves out as a source of 'armchair investigative journalists' who 'hawkishly cover

any credible allegation' of abuse.  Wartberg [sic] Watch's blog bolsters its posts with materials such as 'court records, police reports, video clips of pastors' sermons, and emails.'" (*Id.* ¶ 17.)  "Parsons has also stated that she 'never lie[s] when [she's] writing these blogs' and is 'dead serious about what [she] write[s].'" (*Id.*)

"Recently, Parsons, identified as the 'well-known author of The Wartburg Watch', offered Wilhelm a writing opportunity on Wartburg Watch's blog, which he accepted, stating that his future articles would be found at Wartburg Watch's blog." (*Id.* ¶ 18.) "Wilhelm publicly thanked 'Dee and Deb of the Wartburg Watch' for telling his story and encouraging him to write." (*Id.*)  The complaint alleges that "at all relevant times, [Wilhelm] was acting as an agent of and/or within the scope of his employment or association with the Wartburg Watch, [and] Parsons . . . when publishing and disseminating the defamatory statements alleged in th[e] [c]omplaint." (*Id.*)

### D.    The Article

"On or about August 23, 2024, Defendants, through Wartburg Watch, published a false and defamatory article titled, 'Former IHOPKC Musician Larry Lucky Has Larger Issues to Worry About than a Tik Tok Video Alleging Nefarious Deeds' . . . ." (*Id.* ¶ 19.) This article will be referred to in this order as "The Article."  Wilhelm "was the reporter and/or author of the Article." (*Id.* ¶ 20.)  "The Article was widely disseminated on the internet and was accessible to and viewed by individuals in Arizona, including Lucky's colleagues, clients, friends, and family members." (*Id.* ¶ 21.)

The Article discusses allegations that Lucky had engaged in inappropriate contact with minors while working at IHOPKC. (Doc. 11-1.)[2]  The Article includes the statement:

[2]    Parsons and Wilhelm attach the Article as exhibits to their motions and ask the Court to consider the Article incorporated by reference into the complaint. (Doc. 11 at 4; Doc. 11-1; Doc. 15 at 10; Doc. 15-1.)  Lucky does not appear to object to this request.  The Court may consider the Article without converting Parsons's and Wilhelm's motions into motions for summary judgment because the complaint refers to and relies on the Article, and the Article is central to Lucky's claims. *See, e.g.*, *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the

- 3 -

"On January 12, 2024 I [Wilhelm] was made aware of a TikTok video published by a woman who attended IHOPKC with her family while in her teen years. She alleged that Larry Lucky was attempting to groom boys, two of whom were her brothers." (*Id.* at 3.) The Article explains that Wilhelm had "made a copy of the video and published it on [his] 'X' account." (*Id.*)

> The end of the Article includes the following passage:

> Below you will see two letters I received allegedly from Citron Law Group PLLC on behalf of Larry Lucky. I have reason to believe these letters were not written by Beau Citron of the Citron Law Group. When researching this matter I found that "pretending to be a lawyer to scare someone into compliance can be subject to both criminal and civil penalties."

(*Id.* at 7. *See also* Doc. 1 ¶ 22.) These three sentences will be referred to in this order as "the Statement."

Enclosed with the Article are two cease-and-desist letters ("the Letters"), both of which demanded that Wilhelm "immediately and permanently remove" the above-mentioned post on "X" within seven days or otherwise face potential legal action. (Doc. 11-1 at 8-9.)[3]

The complaint alleges that the Statement "accus[es] Lucky of concrete, unlawful conduct." (Doc. 1 ¶ 23.) The complaint further alleges that the "[S]tatement accusing Lucky of forging an attorney's letter, impersonating an attorney, or any criminal conduct related to such activities, is entirely false" and that "Beau Citron is in fact a licensed and practicing attorney in Arizona, who personally authored and sent the cease-and-desist [L]etters on behalf of Lucky to Wilhelm at Wilhelm's Arizona address." (*Id.* ¶¶ 25-26.) The complaint also notes that "when directly asked in the comments section of the Article

---

12(b)(6) motion.")"; *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.").

[3] "Wilhelm received [these] cease and desist letters from an Arizona attorney on behalf of Lucky, at Wilhelm's Arizona address." (Doc. 1 ¶ 6.)

- 4 -

to substantiate his claims regarding the authenticity of the cease-and-desist letters, Wilhelm refused, stating, 'I believe it would be in my best interest to not state my reasons at this time.'" (*Id.* ¶ 27. *See also* Doc. 11-1 at 10.)

II.     Relevant Procedural Background

On August 21, 2025, Lucky initiated this action. (Doc. 1.)

On September 18, 2025, Wilhelm filed a motion to dismiss. (Doc. 11.)

On September 24, 2025, Parsons filed a motion to dismiss. (Doc. 15.) That same day, the Wartburg Watch filed an answer to the complaint. (Doc. 16.)

On October 2, 2025, Lucky filed a combined response to Wilhelm's and Parsons's motions to dismiss. (Doc. 18.)

On October 8, 2025, Wilhelm and Parsons filed a joint reply in support of their motions to dismiss. (Doc. 19.)

On January 16, 2026, the parties requested a referral to a magistrate judge for a settlement conference. (Doc. 22 at 3.) The Court postponed resolving the pending motions until the completion of the settlement conference, which was unsuccessful. (Doc. 35.)

**DISCUSSION**

I.     Parsons's Motion To Dismiss

Parsons moves to dismiss the claims against her pursuant to Rules 12(b)(2) and 12(b)(6). (Doc. 15.) Because, as discussed below, the Court concludes that it lacks personal jurisdiction over Parsons, it is unnecessary to address Parsons's Rule 12(b)(6) arguments.

A.     **Rule 12(b)(2)**

A defendant may move to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the

motion to dismiss." *Id.* (cleaned up).

When ruling on a motion to dismiss for lack of personal jurisdiction, "uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor," but a "plaintiff may not simply rest on the bare allegations of the complaint." *Id.* (cleaned up). The Court may also consider "deposition testimony and other evidence" outside of the pleadings to determine whether it has personal jurisdiction. *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995). *See also Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 769 (N.D. Cal. 2025) ("The court may also consider declarations and other evidence outside the pleadings to determine whether it has personal jurisdiction.") (cleaned up); 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 12 § 12:31 (2025) ("The plaintiff must supply specific facts in support of personal jurisdiction.").

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). "Arizona law permits the exercise of personal jurisdiction to the extent permitted under the United States Constitution." *Id.* (citing Ariz. R. Civ. P. 4.2(a).) Accordingly, whether the Court has personal jurisdiction over Parsons "is subject to the terms of the Due Process Clause of the Fourteenth Amendment." *Id.*

"Constitutional due process requires that defendants have certain minimum contacts with a forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (cleaned up). Minimum contacts exist "if the defendant has continuous and systematic general business contacts with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Id.* at 1142 (cleaned up).

Lucky does not contend that Parsons is subject to general personal jurisdiction in Arizona. (Doc. 18 at 8 [arguing only that specific personal jurisdiction exists over

Parsons].)  Thus, the Court must apply the Ninth Circuit's three-prong test to determine whether Parsons has sufficient contacts with Arizona to be subject to specific personal jurisdiction: "(1) The non-resident must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable." *Morrill*, 873 F.3d at 1142 (citation omitted).  "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (citation omitted).  "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* (citation omitted).

B.     **The Parties' Arguments**

Parsons argues that she is not subject to specific personal jurisdiction because the "purposeful availment" prong is not satisfied.  (Doc. 15 at 6.)  First, Parsons argues that she has not committed an "intentional act." (*Id.*)  Parsons argues that the complaint "merely alleges that Mrs. Parsons allowed Mr. Wilhelm an opportunity to post on the blog" and that the "[c]omplaint fails to allege any intentional act by Mrs. Parsons in relation to the publication of the Article." (*Id.*)  Parsons also notes that the complaint "does not allege that Mrs. Parsons was responsible for, or had a duty to, screen Mr. Wilhelm's Article, received compensation from Mr. Wilhelm's Article, or otherwise directed or oversaw Mr. Wilhelm's authorship and publication of the Article." (*Id.* at 6-7.)  Parsons further argues that even "if [Lucky] had alleged as much," Parsons's declaration attached to her motion[4] "establishes that Mrs. Parsons did not screen, oversee, or otherwise take part in Mr. Wilhelm's authorship or publication of the Article, and that Mrs. Parsons did not compensate Mr. Wilhelm for posting to the blog," and "[t]herefore, to satisfy his burden to establish Mrs. Parsons committed an intentional act, [Lucky] must produce evidence that

_____

[4]     Parsons's declaration is attached to her motion as Exhibit B.  (Doc. 15-2.)

sufficiently rebuts Mrs. Parsons's evidence." (*Id.* at 7.)  Second, Parsons argues that she did not direct any act toward Arizona. (*Id.*)  Parsons argues that Lucky "acknowledges that Mrs. Parsons is a citizen of *North Carolina*, that [Lucky] is a citizen of *Missouri*, that the subject of the Article concerned events that occurred while [Lucky] worked in *Missouri* and for a *Missouri*-based church, and that as a result of the Article, [Lucky] has suffered harm to his reputation in his community—which is in *Missouri*." (*Id.*)  Parsons argues that Lucky's "sole allegation concerning Arizona is that the blog 'is accessible to and viewed by individuals in Arizona,'" but "the fact that individuals in Arizona *could have* accessed or viewed the Article is insufficient to establish jurisdiction" because Lucky "must show that Mrs. Parsons received a benefit, privilege, or protection from Arizona through marketing, advertising, or conducting business in Arizona" and the complaint does not allege such facts. (*Id.* at 7-8.)  Parsons also emphasizes that she did not "author, publish, or oversee Mr. Wilhelm's publication of the Article." (*Id.* at 7.)  Third, Parsons argues that even "[a]ssuming [Lucky] could establish the first two elements of the purposeful availment prong, [Lucky] cannot prove that Mrs. Parsons likely knew harm would be caused in Arizona" because "[c]ourts generally consider whether the defendant knew whether the plaintiff lived in the forum when determining this element" and Lucky lives in Missouri—thus, Lucky "suffered injury in Missouri, not Arizona." (*Id.* at 8.)  Parsons also argues that even assuming she "is vicariously liable for Mr. Wilhelm's Article, [she] had no knowledge of [Lucky's] residence and [Lucky] does not allege that she did." (*Id.*)  Parsons argues that Lucky "merely alleged that his reputation may have been foreseeably harmed in Arizona, but failed to allege why, how, or in what way his reputation could potentially be harmed in Arizona" and that Lucky "does not describe in any capacity what connection he has to Arizona, if any." (*Id.*)  Put differently, Parsons argues that "even if [she] authored the Article (which she did not), published the Article (which she did not), and purposefully directed the Article and her conduct towards Arizona (which she did not), [Lucky] still cannot satisfy the purposeful availment prong of the due process test because she had no basis to believe that [Lucky], a Missouri resident, would suffer harm in Arizona,

a forum to which [Lucky] has no connection." (*Id.* at 8-9.)

In response, Lucky argues that "Parsons is the editor of Defendant The Wartburg Watch . . . and operates it as a blog, reaching all corners of the internet." (Doc. 18 at 2.) Lucky argues that "Parsons, who publicly presents herself as a serious 'investigative journalist' who is 'dead serious' about the truth of what she publishes, purposefully directed tortious activity at this forum when publishing Wilhelm's defamatory statement on the blog." (*Id.*) Lucky argues that the "[c]omplaint pleads sufficient facts to establish a plausible claim that Parsons is vicariously liable for the defamatory publication—a claim substantiated by her own public admission of being the 'editor' of The Wartburg Watch and her statements detailing her editorial control and sophisticated understanding of defamation law." (*Id.*) As for the "first prong of the three-prong minimum contacts test (commonly referred to as purposeful direction)," Lucky argues that "Parsons committed an intentional act that was aimed at this forum and caused harm, which she knew was likely to be suffered in this forum." (*Id.* at 8.) Lucky argues that where, as here, an intentional tort is alleged, the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984), applies. (*Id.*) Lucky acknowledges that "[i]n the context of an interactive website, operation of the website alone does not constitute express aiming—the plaintiff needs to allege 'something more.'" (*Id.* at 9, citation omitted.) Put differently, Lucky argues that "[w]hen the website itself is the *only* jurisdictional contact, [the] analysis turns on whether the site had a forum-specific focus or the defendant exhibited an intent to cultivate an audience in the forum." (*Id.*, citation omitted.) Nevertheless, Lucky argues that "[i]n this case, [t]here is a direct connection between this forum and the underlying controversy" because "Wilhelm is a resident of Arizona and authored the Article at issue, including the defamatory [S]tatement" and because "Lucky alleged that Wilhelm is integrally intertwined with The Wartburg Watch, including Parsons." (*Id.*) Lucky emphasizes that "Wilhelm publicly thanked 'Dee and Deb of the Wartburg Watch' for telling his story and encouraging him to write." (*Id.*, citing Doc. 1 ¶ 18.) And Lucky argues that "Parsons cannot deny with a straight face her entanglement with Wilhelm, or that he resides in and writes from Arizona"

and "also cannot deny with a straight face that she operates and is the editor of The Wartburg Watch, which adopted and published the Article that contains the defamatory statement and filed an Answer in this matter, admitting and consenting to jurisdiction." (*Id.* at 9-10.)  Lucky also notes that "Parsons accepted service of the [c]omplaint on behalf of The Wartburg Watch at her residence."  (*Id.* at 10.)  Lucky argues that the "Wartburg Watch is not a distinct legal entity that provides Parsons with a shield, she cannot assert that the Court has no personal jurisdiction over her when she admits the Court has it over her blog, an alter ego of her and an entity for which she accepted service.  Moreover, The Wartburg Watch is an interactive blog, which encourages commentary from people all over the world, including Arizona.  Parsons's relationship with Wilhelm, as well as posting his articles on her blog, establish the direct connection necessary for this Court to exercise specific personal jurisdiction over her."  (*Id.*)  Next, "[r]egarding the second prong of the three-prong minimum contacts test," Lucky argues that the allegations in the complaint "establish that his defamation claim undoubtedly arises out of the intertwined relationships between Wilhelm, Parsons, and The Wartburg Watch.  Wilhelm, the Arizona resident, authored the defamatory [S]tatement.  The Article, which contains the defamatory statement, was posted on The Wartburg Watch.  And The Wartburg Watch is operated by Parsons, edited by Parsons, disseminates information across the nation, and invites interactive commentary with people all over the nation, including residents of this forum– the home state of the originator of the defamatory [S]tatement."  (*Id.*)  Lucky also argues that the "Article was not about a random topic; it was authored by Wilhelm, an Arizona resident, and centered on his receipt of legal correspondence at his Arizona address from an Arizona law firm.  The defamatory statement calls into question Lucky's alleged unauthorized practice of law *in Arizona* and alleged forgery *in Arizona*."  (*Id.*)  Last, "regarding the third prong," Lucky argues that "the Court's exercise of specific personal jurisdiction would not be unreasonable for all of the reasons stated above."  (*Id.*) Specifically, Lucky argues that "Wilhelm obviously cannot contest personal jurisdiction," and the "Wartburg Watch filed an Answer and did not raise lack of personal jurisdiction as

an affirmative defense, which is a waiver of such a defense." (*Id.*)  Thus, Lucky argues that "Parsons, not being under a corporate shield of some kind extended by The Wartburg Watch, cannot benefit from a 'defense' that her alter ego does not raise." (*Id.* at 10-11.)

In reply, Parsons argues that Lucky "fails to address how Mrs. Parsons is connected to Arizona." (Doc. 19 at 5.)  Instead, Parsons argues that Lucky "analyzes how Mr. Wilhelm—not Mrs. Parsons—is intertwined with [the Wartburg Watch] and contends that because [the Wartburg Watch] is an online blog accessible in Arizona that Mrs. Parsons is also subject to Arizona jurisdiction." (*Id.*)  Parsons argues that "[i]n fact, [Lucky] admits that the only basis for Mrs. Parsons being subject to this Court's jurisdiction is her 'relationship with Wilhelm, as well as posting articles on' [the Wartburg Watch]." (*Id.*) Parsons argues that "[i]n the same breath, [Lucky] argues that jurisdiction exists because the Article was 'authored by Wilhelm, an Arizona resident, and centered on his receipt of legal correspondence at his Arizona address from an Arizona law firm,' "[b]ut none of this relates to *Parsons*, the defendant that is contesting jurisdiction." (*Id.* at 5-6.)  In sum, Parsons argues that "[b]ecause [Lucky] has not produced any evidence in support of his jurisdictional facts, and the unsupported allegations [Lucky] relies on concern Wilhelm, not Parsons, the Court should dismiss the [c]omplaint as to Parsons." (*Id.* at 6.)

C.    **Analysis**

Defamation is an "intentional tort." *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 603 (9th Cir. 2018).  "A purposeful direction analysis applies in suits sounding in tort where the tort was committed outside the forum state." *Id.* at 605.[5]  The *Calder* "effects test" "is normally employed in purposeful direction cases." *Yahoo! Inc. v. Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).  The Ninth Circuit "construe[s] *Calder* to impose three requirements: the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3)

---

[5]    Even assuming that *Wilhelm's* alleged conduct occurred inside Arizona, *Parsons's* alleged conduct occurred in North Carolina where she operates the Wartburg Watch and publishes articles.

causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (cleaned up).

Even assuming that Parsons's operation of the Wartburg Watch and publication of the Article (Doc. 1 ¶¶ 3,7) qualifies as an "intentional act," Lucky has not met his burden of showing that Parsons expressly aimed this conduct at Arizona.

"More than two decades ago, [the Ninth Circuit] recognized a distinction between 'passive' websites that merely make information available to visitors and 'interactive' websites, where 'users can exchange information with the host computer when the site is interactive.'" *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023). (citation omitted). "It is well settled that mere passive operation of a website is insufficient to demonstrate express aiming." *Id.* (cleaned up). "Similarly, operation of an interactive website does not, by itself, establish express aiming. Otherwise, every time a seller offered a product for sale through an interactive website, the seller would be subjecting itself to specific jurisdiction in every forum in which the website was visible, whether or not the seller actually consummated a sale. That result would be too broad to comport with due process." *Id.* "But operating a website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient to satisfy the express aiming prong." *Id.* at 1092 (cleaned up). "The interactivity of the website is one of several factors that can be relevant to the question whether a defendant has done 'something more.'" *Id.* (cleaned up). The Ninth Circuit has "acknowledged that there is a 'sliding scale' of how interactive a website is, and a higher degree of interactivity provides greater support for the exercise of specific jurisdiction." *Id.* at 1092 n.3.[6] "In some cases, the operators of a website can be said to

---

[6]    The "sliding scale" test ultimately derives from *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997). The Court observes that some courts have approached the *Cybersell* sliding-scale test as an independent test distinct from the *Calder* effects test, whereas other courts have applied the *Cybersell* sliding-scale test as part of the second prong of the *Calder* effects test. Because the result here is the same regardless of whether the *Cybersell* sliding-scale test is used as a separate test or as a component of the second prong of the *Calder* effects test, the Court will follow the latter approach as in *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 (9th Cir. 2011), and *Herbal Brands*, 72

have 'expressly aimed' at a forum state where a website with national viewership and scope appeals to, and profits from, an audience in a particular state." *Id.* (cleaned up). But "[w]hen the website itself is the *only* jurisdictional contact, our analysis turns on whether the site had a forum-specific focus or the defendant exhibited an intent to cultivate an audience in the forum." *Id.* Put differently, "[i]n determining whether a nonresident defendant has done 'something more,' we have considered several factors, including the interactivity of the defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant 'individually targeted' a plaintiff known to be a forum resident." *Mavrix Photo*, 647 F.3d at 1229 (citations omitted).

The only allegation in the complaint addressing personal jurisdiction over Parsons in Arizona is the following:

> This Court has personal jurisdiction over Wartburg Watch, [and] Parsons, . . . because they conduct an online presence and, more specifically a "blog", that is accessible to and viewed by individuals in Arizona and, further, published the defamatory article on the blog that specifically targeted Lucky, whose reputation could foreseeably be harmed in Arizona, and intentionally directed their activities towards this forum. Wartburg Watch, [and] Parsons, . . . therefore have sufficient minimum contacts with this forum for purposes of this Court exercising personal jurisdiction over them.

(Doc. 1 ¶ 7.) In other words, the complaint simply alleges that Parsons operates the Wartburg Watch, that the Wartburg Watch is accessible in Arizona, that Parsons published the Article on the Wartburg Watch, and that it was foreseeable that Lucky's reputation would be harmed everywhere (including in Arizona) as a result of the Article. (*See also* Doc. 18 at 10 ["The Wartburg Watch is operated by Parsons, edited by Parsons, disseminates information across the nation, and invites interactive commentary with people all over the nation, including residents of this forum . . . ."].) But the mere fact that Parsons published the Article on a blog that is accessible in Arizona is insufficient to confer specific personal jurisdiction over Parsons. Instead, the complaint must allege "something more"— i.e., "conduct directly targeting the forum." *Mavrix*, 647 F.3d at 1229, 1231 (personal

F.4th 1085.

- 13 -

jurisdiction would unlikely exist over a "a local newspaper, an individual, *or an unpaid blogger who posted an allegedly actionable comment or photo to a website accessible in all fifty states, but who could not be as certain . . . that his actions would be so widely observed and who did not seek commercial gain from users outside his locality*" because "[n]ot all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every state in which it is accessed") (emphasis added).

In *Cybersell*, the Ninth Circuit cited *Benusan Rest. Corp. v. King*, 937 F. Supp. 295 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 25 (2d Cir. 1997), with approval, explaining that in *Benusan*, the defendant, the owner of a Missouri jazz club, "created a general access web page that contained information about the club in Missouri as well as a calendar of events and ticketing information" but that "[t]ickets were not available through the web site." *Cybersell*, 130 F.3d at 417 (footnote omitted).  The Ninth Circuit referred to this type of website as "passive." *Id.* at 418.  Quoting *Benusan*, the Ninth Circuit explained: "Creating a site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed toward the forum state." *Id.* (quoting *Bensusan*, 937 F. Supp. at 301).  After discussing several other persuasive authorities, the Ninth Circuit held that "the common thread . . . is that the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 419.  Applying that rule to the facts of the case before it, the Ninth Circuit held:

> Here, Cybersell FL has conducted no commercial activity over the Internet in Arizona.  All that it did was post an essentially passive home page on the web, using the name "CyberSell," which Cybersell AZ was in the process of registering as a federal service mark.  *While there is no question that anyone, anywhere could access that home page and thereby learn about the services offered, we cannot see how from that fact alone it can be inferred that Cybersell FL deliberately directed its merchandising efforts toward Arizona residents.*
>
> Cybersell FL did nothing to encourage people in Arizona to access its site, and there is no evidence that any part of its business (let alone a continuous

part of its business) was sought or achieved in Arizona. . . .  No money changed hands on the Internet from (or through) Arizona.  In short, Cybersell FL has done no act and has consummated no transaction, nor has it performed any act by which it purposefully availed itself of the privilege of conducting activities, in Arizona, thereby invoking the benefits and protections of Arizona law.

We therefore hold that Cybersell FL's contacts are insufficient to establish "purposeful availment."  Cybersell AZ has thus failed to satisfy the first prong of our three-part test for specific jurisdiction.  We decline to go further solely on the footing that Cybersell AZ has alleged trademark infringement over the Internet by Cybersell FL's use of the registered name "Cybersell" on an essentially passive web page advertisement.  Otherwise, every complaint arising out of alleged trademark infringement on the Internet would automatically result in personal jurisdiction wherever the plaintiff's principal place of business is located.  That would not comport with traditional notions of what qualifies as purposeful activity invoking the benefits and protections of the forum state.

*Id.* at 419-20 (emphasis added).

District courts within the Ninth Circuit have applied *Cybersell* when evaluating whether personal jurisdiction exists over defendants accused of engaging in defamation via website postings.  For example, in *Hayes v. Bevil*, 2005 WL 8160696 (D. Ariz. 2005), the plaintiff, an Arizona resident, sued the defendants, residents of Louisiana.  *Id.* at *1.  The defendants operated Cattyshaq.com, "an online forum, dedicated to 'open discussion of online scams,' set up for the public to post information regarding suspected online scams.  Anyone who visits the website can obtain that information and post one's own information.  The website does not sell or promote a service and there is no commercial conduct initiated on its behalf."  *Id.*  The defendants moved to dismiss for lack of personal jurisdiction.  *Id.* at *2.  The court agreed: "In the Ninth Circuit the mere posting of information on an otherwise passive website is insufficient to subject a party to personal jurisdiction.  Rather, in the Ninth Circuit, 'the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.'"  *Id.* at *3 (cleaned up).  First, the court explained that "Cattyshaq.com" was a "passive" website because "[i]t is set up for the public to post

information regarding certain companies and anyone who visits the website can obtain that information or post one's own message.  There is no service being sold or promoted and no affirmative commercial conduct initiated on behalf of the website."  *Id.* (quoting *Medinah Mining, Inc. v. Amunategui*, 237 F. Supp. 2d 1132, 1135 (D. Nev. 2002)).  "Thus, Defendants merely operate a website that is accessible, and is in fact accessed, from anywhere in the world."  *Id.*  The same is true here.  The complaint simply alleges that personal jurisdiction exists over Parsons because she "conduct[s] an online presence and, more specifically, a 'blog', that is accessible to and viewed by individuals in Arizona." (Doc. ¶ 7.)  The complaint does not allege that the Wartburg Watch caters specifically to an Arizona audience.  Nor does the complaint allege that there is any service being sold through the website to residents of Arizona.  Moreover, Parsons's declaration avers that (1) the Wartburg Watch "does not advertise or market its posts, does not engage in commercial activity, and does [not] receive any form of revenue or compensation from any source";[7] (2) the Wartburg Watch "does not advertise in Arizona and does not solicit customers, viewers, or otherwise direct activity towards Arizona"; and (3) the Wartburg Watch "was intended, and is, simply a forum for [Parsons] and others to post commentary opinion articles regarding current events." (Doc. 15-2 ¶¶ 8-9.)  Neither the complaint (Doc. 1) nor Lucky's declaration in response to Parsons's motion (Doc. 18-1) disputes these facts. Thus, the Wartburg Watch is a passive website, and Parsons's operation of that website is alone insufficient to confer personal jurisdiction over her.

Nevertheless, the *Hayes* court held that "while Defendants' website itself is passive, this Court must still determine whether Defendants' allegedly tortious activity thereon can also be considered passive."  2005 WL 8160696 at *3.  In *Hayes*, the plaintiff "accuse[d] Defendants of posting, and allowing others to post, allegedly defamatory information regarding Plaintiff on the Cattyshaq.com website."  *Id.*  But the court held that, once again,

---

[7]    The Court presumes, based on the syntax of this sentence, that this paragraph of Parsons's declaration was intended to say that the Wartburg Watch "does [*not*] receive any form of revenue or compensation from any source."  (Doc. 15-2 ¶ 8.)

that "the Ninth Circuit held in *Cybersell* that 'something more' is required . . . [beyond] merely posting information on a website." *Id.* The court found that "[t]hat 'something more' [was] absent" because, *inter alia*: "[t]here [was] no evidence that Defendants deliberately directed their activities toward Arizona residents"; "Defendants did nothing to encourage people in Arizona to access Cattyshaq.com"; "[t]here [was] no evidence that any Arizonan other than Plaintiff, or his attorney . . . accessed Defendants' website"; "Defendants did not enter into any contracts in Arizona, made no sales in Arizona, . . . and earned no income from Arizona"; "[t]here [was] no evidence that Defendants had any contact with Arizona other than the postings on their website, which could be accessed by anyone"; and "[t]here [was] no evidence to suggest that Defendants reached out to Arizona any more than to persons residing elsewhere." *Id.* The same is true here. The complaint does not allege, and Parsons's declaration disavows, that the Wartburg Watch specifically encourages Arizona readers to visit the blog or that the Wartburg Watch is involved in any commercial activity in Arizona. At most, the complaint vaguely alleges that the Article was "accessible to and viewed by individuals in Arizona."[8] As in *Hayes*, there is "no evidence to suggest that [Parsons] reached out to Arizona any more than to persons residing elsewhere." *Id.* at *3.

Similarly, in *Medinah Mining*, "the parties' main dispute [was] whether Ingram's

---

[8] Specifically, the complaint vaguely alleges that "[t]he Article was widely disseminated on the internet and was accessible to and viewed by individuals in Arizona, including Lucky's colleagues, clients, friends, and family members." (Doc. 1 ¶ 21.) And in his declaration attached to his response brief, Lucky avers that the "damage to [his] professional integrity and [his] businesses . . . is not confined to [his] local community in Missouri but extends across the country, including to Arizona, where [he] ha[s] business and personal connections." (Doc. 18-1 ¶ 7.) These unspecific allegations are insufficient. Gensler, § 12:31, *supra* ("The plaintiff must supply specific facts in support of personal jurisdiction."). And as discussed, these vague and conclusory allegations do not show that *Parsons* specifically directed her activities at Arizona as opposed to the nation at large. Indeed, Lucky's declaration avers that it is "[t]he *national reach* and reputation of The Wartburg Watch" that is "central to the harm [he] ha[s] suffered" and that "the defamatory accusation against [him] was disseminated to a *national audience*." (Doc. 18-1 ¶ 7, emphases added.)

alleged posting of defamatory statements on a website [was] sufficient to" support the assertion of personal jurisdiction over Ingram. 237 F. Supp. 2d at 1135. The "[p]laintiffs accuse[d] Ingram of allegedly posting defamatory information about Medinah and Price on the Raging Bull website." *Id.* The court held that the website at issue was passive for the same reasons identified in *Hayes*. *Id.* The court continued:

> [H]ere, there is no evidence that Ingram did any business with anyone in Nevada or that he directed his allegedly defamatory comments at Nevada. He posted messages on a website that could be accessed by anyone around the world who had access to the Internet. There is no evidence that any Nevada resident actually did access the alleged defamation. Moreover, Price is a citizen of Canada and Medinah is headquartered in California, with its operations in Chile, which makes the inference that Ingram's alleged defamation was directed at Nevada even more tenuous.

*Id.*[9] As discussed, there is no evidence that Parsons, through the Wartburg Watch, does business in Arizona—at most, the complaint alleges that Parsons operates the Wartburg Watch from North Carolina and that the blog is accessible everywhere in America, including Arizona. Moreover, similar to *Medinah*, Lucky is a resident of *Missouri*, not Arizona, "which makes the inference that [the] alleged defamation was directed at [Arizona] even more tenuous." *Id.*

Lucky's arguments in his response brief do not compel a different result. Lucky emphasizes that the "Wartburg Watch is operated by Parsons, edited by Parsons, disseminates information across the nation, and invites interactive commentary with people all over the nation, including residents of [Arizona]." (Doc. 18 at 10.) But this argument only proves the point—*at most*, any "allegedly defamatory statements were directed at the

[9]    In its analysis under the *Calder* "effects test," the *Medinah Mining* court rejected the plaintiff's argument "that alleged defamatory postings on the Internet alone are enough to subject a defendant to personal jurisdiction in a forum where the alleged defamation can be accessed under the effects test." *Id.* at 1137. The court emphasized that in the case before it, one plaintiff, Medinah, was "merely incorporated in Nevada," the forum state, but "[i]ts principal place of business, headquarters and operations are not in Nevada." *Id.* Moreover, the other plaintiff "Price [was] a citizen of Canada." *Id.* at 1138. Thus, the court held that the plaintiffs had "present[ed] no evidence that Ingram targeted Nevada or its residents in making his alleged defamatory statements." *Id.*

Internet community generally without regard for whether any result, intended or otherwise, would result in [Arizona]." *Cummins v. Lollar*, 2013 WL 12124089, \*6 (C.D. Cal. 2013).

Lucky also emphasizes that "Wilhelm is a resident of Arizona and authored the Article at issue" and "Wilhelm is integrally intertwined with The Wartburg Watch, including Parsons and Martin." (Doc. 18 at 9.) To the extent Lucky's "integrally intertwined" argument is an attempt to assert personal jurisdiction over Parsons (a non-Arizona resident) through Wilhelm (an Arizona resident) under an agency theory, that argument fails. As an initial matter, it's unclear whether the Ninth Circuit recognizes an agency test in the context of specific personal jurisdiction. "Historically, the Ninth Circuit used an agency test to determine personal jurisdiction. Under that test, a subsidiary's contacts with a forum jurisdiction could be attributed to a parent corporation if the subsidiary performed functions 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Luna v. Taurus Int'l Mfg. Inc.*, 2025 WL 2676084, \*6 (D. Ariz. 2025) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001)). The Supreme Court later "rejected this agency test as applied to general jurisdiction" but "left open the possibility that agency relationships may be relevant to the existence of *specific* jurisdiction." *Id.* (cleaned up). Then, in 2017, the Ninth Circuit in *Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017), held that the Supreme Court's decision was "irreconcilable" with the agency test previously used by the Ninth Circuit. *Luna*, 2025 WL 2676084 at \*6. The Ninth Circuit "then assumed, without deciding, that some standard of agency continues to be relevant to the existence of specific jurisdiction but nonetheless found that specific jurisdiction was lacking because under any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities,' and appellants neither alleged nor otherwise showed that the parent company had such control." *Id.*(cleaned up).

As this Court has previously observed, "[i]n the wake of *Williams*, district courts in the Ninth Circuit have largely followed two different approaches to the agency test as it

applies to specific jurisdiction.  First, some courts have held that a subsidiary's contacts cannot be attributed to a parent corporation under any theory of agency.  Second, other courts have concluded that a subsidiary's jurisdictional contacts can be attributed to a parent corporation when the parent exercises 'substantial control' over its subsidiary." *Id.* (citations omitted).  "If the former interpretation is correct, [Lucky's] agency theory is a non-starter." *Id.* at *7.  "And even assuming the latter interpretation is correct," and further assuming that the latter interpretation is also potentially applicable in the context of individual co-defendants (as opposed to corporate entities with a parent-subsidiary relationship), Lucky has still "failed to make the necessary showing here because" neither the complaint nor Lucky's declaration supports that Parsons "substantially controlled" Wilhelm's activities.  *Id.*

In his response brief, Lucky appears to assume that Parsons "post[ed] [Wilhelm's] articles on her blog" (Doc. 18 at 10) and that Parsons has some level of "editorial control" over the articles on The Wartburg Watch (*id.* at 2).  But these vague and conclusory assumptions do not actually appear as allegations in the complaint.  At most, the complaint makes two conclusory statements that (1) "[a]t all relevant times, Defendants acted within the scope of their operation of Wartburg Watch, individually, and/or jointly in the publication and dissemination of defamatory statements alleged in this [c]omplaint"; and (2) there exists an "ongoing collaborative relationship between Defendants" such that "Wilhelm, at all relevant times, was acting as an agent of and/or within the scope of his employment or association with Wartburg Watch, Parsons, and Martin, when publishing and disseminating the defamatory statements alleged in this [c]omplaint." (Doc. 1 ¶¶ 11, 18.)  But such conclusory allegations of an agency relationship are insufficient. *See, e.g.*, *Williams*, 851 F.3d at 1025 n.5 (holding that the "conclusory legal statement unsupported by any factual assertion" that "'Defendants . . . were the agents or employees of each other and were acting at all times within the course and scope of such agency and employment . . . and are legally responsible because of their relationship with their co-Defendants'" was insufficient to establish specific jurisdiction under an agency theory because there were no

factual allegations of "control" as required to establish an agency relationship) (alterations in original); *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) ("[M]ere 'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden.").

In his declaration attached to his response brief, Lucky avers that Parsons self-identifies as the "Editor" of the Wartburg Watch, that Parsons "published" the Article, and that Lucky has "read Ms. Parsons' public statements in which she describes her meticulous editorial process, including holding stories until she is 'convinced of the story's veracity' and independently verifying facts." (Doc. 18-1 ¶¶ 5-6, 8.)  But none of these new factual allegations speaks to Parsons having "substantial control" over any Wartburg Watch contributor, much less Wilhelm.[10]  By contrast, Parsons's declaration states explicitly that the Wartburg Watch "does not have any employees"; that Parsons "do[es] not compensate Mr. Wilhelm for posting opinion articles to the [Wartburg Watch]"; and that "[n]either [Parsons] nor anyone else on behalf of the [Wartburg Watch] supervise Mr. Wilhelm, direct or control the subject matter for which he decides to write about, and do not screen or otherwise approve any material Mr. Wilhelm authors or publishes to the [Wartburg Watch], including the [A]rticle Mr. Wilhelm published to the [Wartburg Watch] on August 23, 2024, that is the subject of the above-captioned lawsuit." (Doc. 15-2 ¶¶ 8, 11-12.)

Finally, Lucky's argument that the Wartburg Watch filed an answer, thereby "admitting and consenting to jurisdiction," and that Parsons is somehow bound by that admission under an "alter ego" theory (Doc. 18 at 10-11), is undeveloped and unpersuasive. Lucky does not cite a single case that holds that personal jurisdiction can be exercised over one defendant based on another defendant's failure to challenge personal jurisdiction in an

___

[10]    For example, Lucky's declaration does not aver that Parsons screens articles authored *by others* before they are published on the Wartburg Watch.  Although paragraph eight of Lucky's declaration states that Parsons's editorial process "includ[es] holding stories" until Parsons verifies the facts contained therein (Doc. 18-1 ¶ 8), it's unclear whether that is Parsons's editorial process for her own articles or whether Parsons somehow controls the content of other contributors' articles.  At any rate, nothing in this paragraph suggests that Parsons exercised "substantial control" over Wilhelm specifically.

answer.  And the complaint contains no allegations regarding an "alter ego" theory.[11]

In sum, Lucky has not met his burden of showing that Parsons expressly aimed any allegedly defamatory statement at Arizona, and thus Lucky has not shown purposeful direction as required by *Calder*.[12]  Accordingly, the Court lacks personal jurisdiction over Parsons.

II.    Wilhelm's Motion to Dismiss

Wilhelm moves to dismiss pursuant to Rule 12(b)(6).  (Doc. 11.)

A.    **Rule 12(b)(6)**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of

---

[11]    Lucky also argues that the Article "was authored by Wilhelm, an Arizona resident, and centered on his receipt of legal correspondence at his Arizona residence from an Arizona law firm" and that the alleged "defamatory [S]tatement calls into question Lucky's alleged unauthorized practice of law *in Arizona* and alleged forgery *in Arizona*."  (Doc. 18 at 10.)  This argument, too, is unavailing.  As an initial matter, Lucky lives in Missouri and there is nothing to suggest that Lucky drafted or sent the Letters in Arizona.  Moreover, Lucky's argument that the Article was "centered on [Wilhelm's] receipt of" the Letters (*id.*) is a mischaracterization of the Article.  The Article focuses on Lucky (a Missouri resident) and his alleged inappropriate encounters at a Missouri church.  (Doc. 11-1.)  Although the Article does cite the Letters, that discussion is made in reference to the lengthy discussion that precedes it regarding Lucky's alleged misconduct *in* Missouri—any relationship to Arizona is tenuous at best and does not support that the Article is somehow *focused* on Arizona. *Cf. Young v. New Haven Advoc.*, 315 F.3d 256, 263-64 (4th Cir. 2002) (acknowledging the allegedly defamatory articles "included discussions about the allegedly harsh conditions at the Wallens Ridge prison [in Virginia], where Young was warden" but noting that "[t]he focus of the articles, however, was the Connecticut prisoner transfer policy and its impact on the transferred prisoners and their families back home in Connecticut" and thus "Connecticut, not Virginia, was the focal point of the articles").

[12]    These conclusions render it unnecessary to address the remaining *Calder* factors, as well as the remaining specific personal jurisdiction factors as set forth in *Morrill*.

material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### B.    The Parties' Arguments

Wilhelm argues that "[t]o survive a motion to dismiss a defamation claim," Lucky must show that the allegedly defamatory Statement is "not mere comment within the ambit of the First Amendment." (Doc. 11 at 5, citation omitted.) Wilhelm argues that "[g]enerally defamation is governed by state law, however the First Amendment safeguards for freedom of speech limit state law and provide constitutional protection to statements of opinion on matters that do not contain or imply a provable factual assertion." (*Id.*) Thus, Wilhelm argues that "when it is clear that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise on a matter, the statement is not actionable" and "[w]hether a statement is actionable for defamation is therefore conditioned upon 'whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact'"—"[i]f there is no assertion of objective fact, the claim is foreclosed by the First Amendment." (*Id.*) Next, Wilhelm argues that the Statement constitutes protected opinion under the Ninth Circuit's "three-part test to determine whether a statement asserts an objective fact or is protected under the First Amendment." (*Id.*) Defendant analogizes this case to *Hosszu v. Barrett*, 202 F. Supp. 3d 1101 (D. Ariz. 2016), *aff'd*, 716 F. App'x 622 (9th Cir. 2017). (*Id.* at 5-6.) Wilhelm then proceeds to apply the Ninth Circuit's three-factor test to the facts of this case. As for the first factor, the general tenor of the work, Wilhelm argues this factor weighs in his favor because blogs are "a form of media known for containing opinionated writings and personal perspectives." (*Id.* at 6.) Wilhelm also argues that "[e]ven considering the

Statement itself, the plain text of the Statement makes it clear that Mr. Wilhelm is expressing his personal opinion" and that he included "his reasoning and the sources from which he gained his opinions." (*Id.* at 6-7.) As for the second factor, the use of hyperbolic or figurative speech, Wilhelm "does not contest that the Article, nor the Statement, did not include hyperbolic or figurative speech," but he argues that, "as illustrated by the *Hosszu* court, this is immaterial to the determination of whether the Statement is actionable defamation." (*Id.* at 7.) As for the third factor, whether the statement can be proved true or false, Wilhelm argues that "it cannot be because it is Mr. Wilhelm's personal opinion." (*Id.*) Wilhelm argues that the "Statement merely recited Mr. Wilhelm's personal perspective and belief that the Letters were not sent by Beau Citron because of the manner in which the Letters were authored" and that "Mr. Wilhelm inserted pictures of the Lettres [sic] into the Article which indicate why Mr. Wilhelm held that belief: because the Letters did not include an email address for Citron Law Group or Beau Citron, a physical address, phone numbers, fax numbers, or an attorney State Bar number for Mr. Citron, and were written in a manner Mr. Wilhelm expected an attorney to write." (*Id.*) Wilhelm also argues that his "opinions and belief for why the Letters were questionable are also held by others"—for example, one person commented on his Article that "the fact there is no contact info [on the Letter] is my first red flag that this is not an official letter." (*Id.*) Next, Wilhelm argues that even "if the Court were to entertain the legal contention in the [c]omplaint that whether the Letters were sent by Beau Citron could have been proven true by inquiring with Beau Citron, the Court must still dismiss the case" because the Letters contained no contact information for Beau Citron and thus "even if Mr. Wilhelm wanted to contact Mr. Citron, the Letters provided no way for him to do so." (*Id.* at 8.) Wilhelm also argues that he "research[ed] the return address for the Letters" and "not a single search result related to Citron Law Group or Beau Citron." (*Id.*) Last, Wilhelm argues that "[e]ven if the Statement is actionable under the First Amendment, [Lucky's] claim fails because the Statement does not constitute defamation." (*Id.*) Wilhelm argues that he "does not dispute that the Statement was published to third persons"; however, "even the bare

allegations of the [c]omplaint prove that the Statement is not false"[13] and that the Statement does not identify Lucky. (*Id.* at 9.) Specifically, Wilhelm argues that (1) "[t]he Statement does not accuse [Lucky] of pretending to be a lawyer," (2) "[n]or does the Statement accuse Mr. Wilhelm [sic] of trying to scare Mr. Wilhelm into complying with the demands in the Letters," and (3) "nor [do] the remaining portions of the Article, identify, accuse, or state that [Lucky] is the person that Wilhelm believes sent the Letters." (*Id.*) To the contrary, Wilhelm argues that "the Statement merely states that Mr. Wilhelm believes the Letters were not sent by the Citron Law Group." (*Id.*)

In response, Lucky argues "that the Court must accept all well-pleaded factual allegations as true for purposes of ruling on the Motion[] to Dismiss," and thus Wilhelm's "arguments directed towards disputes regarding material facts should fall on deaf ears as they are *affirmative defenses* to be pled, established in discovery, and proved at trial." (Doc. 18 at 11.) Lucky further argues that Wilhelm "misapprehend[s] the standard of review in arguing for dismissal under Rule 12(b)(6), which requires that all factual allegations be taken as true and construed in the light most favorable to the nonmoving party," that the "admissibility of the evidence supporting the allegations or factual disputes about the evidence are simply not at issue," and that Wilhelm's "First Amendment and other factually-based arguments are therefore without merit at this stage and are simply affirmative defenses, proper to plead in an Answer and establish through discovery and proven at trial." (*Id.* at 12.)[14]  Next, Lucky argues that "the threshold question in

---

[13]    To the extent Wilhelm is arguing that the Court should dismiss Lucky's defamation claim because his statement that the Letters were not written by Beau Citron is true, that argument lacks merit. At the motion to dismiss stage, the Court must accept all well-pleaded allegations in the complaint as true. The complaint unequivocally alleges that Wilhelm's statement "is entirely false" and that "Beau Citron is in fact a licensed and practicing attorney in Arizona, who personally authored and sent the cease-and-desist letters on behalf of Lucky to Wilhelm at Wilhelm's Arizona address." (Doc. 1 ¶¶ 25-26.)

[14]    To the extent Lucky is arguing that the question of whether an allegedly defamatory statement is protected opinion under the First Amendment cannot be resolved at the motion to dismiss stage, that argument is without merit. *See, e.g.*, *Hosszu*, 716 F. App'x at 623 (affirming the district court's resolution of this issue at the motion to dismiss stage).

defamation suits is not whether a statement might be labeled opinion, but rather whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." (*Id.*, cleaned up.) Lucky argues that he "has alleged that his Arizona attorney's identity was objectively verifiable and, as a result, any 'belief' by Wilhelm about Lucky's actions or conduct was not a protected opinion" and "a reasonable factfinder could conclude that Wilhelm's statement was an assertion of an objectively verifiable fact." (*Id.*) Lucky also argues that Wilhelm's reliance upon *Hosszu* is "misplaced" and that "[h]iding behind the characterization of a 'blog' as a 'form of media known for containing personal opinion and commentary' does not give [Wilhelm] free reign to falsely accuse Lucky (or anyone else for that matter) of committing a crime or impersonating a lawyer." (*Id.* at 13, citation omitted.) Lucky argues that "[t]he ease of verification distinguishes this case from those like *Hosszu*, where the court found speculation about an athlete's potential use of *undetectable* performance-enhancing drugs to be protected opinion." (*Id.*) Lucky argues that "[t]he bottom line is that Lucky has alleged facts supporting the essential elements of a defamation claim: (1) Wilhelm implied Lucky was impersonating an attorney and committing a crime; (2) Defendants, without any privilege to do so, published the statement on the internet for all to see; (3) Defendants acted with the requisite degree of fault; and [4] Lucky suffered damages or, in the alternative, damages are presumed because the defamatory statement accused Lucky of a crime." (*Id.* at 13-14.)

In reply, Wilhelm contends that the Court "need only look to the Statement and must ignore the following allegations [Lucky] includes in [the] [c]omplaint": (1) "The Statement is not pure opinion"; (2) "The reference to criminal and civil penalties further conveys to the average reader that Wilhelm is accusing Lucky of concrete, unlawful conduct, not merely expressing a subjective viewpoint"; (3) "The Statement 'implies underlying false facts and defamatory facts'"; (4) "The information in the Statement is 'objectively verifiable.'" (Doc. 19 at 3.) Wilhelm also argues that the "Court must ignore the additional allegations below on the basis that they are patently false and can be proven false by the very text of the Statement": (1) "The Statement 'falsely asserts that Lucky engaged in the

criminal acts of forgery and/or impersonating a lawyer in Arizona'"; and (2) "The Statement accuses Lucky of 'engag[ing] in the unauthorized practice of law or forgery.'" (*Id.*) And Wilhelm argues that "[w]hen analyzing the Statement, and not [Lucky's] impermissible conclusions of law and fact, the Court is compelled to make the following determinations": (1) "The Statement does not include Lucky's name in any manner"; (2) "The Statement does not state or insinuate that Lucky impersonated a lawyer. It only states that pretending to be a lawyer *can* subject the impersonator to consequences"; (3) "The Statement does not accuse Lucky of engaging in 'criminal acts of forgery'"; (4) "The Statement does not accuse Lucky of 'engaging in the unauthorized practice of law'"; and (5) "The Statement does not accuse Lucky of 'committing a crime or impersonating a lawyer.'" (*Id.* at 3-4.) Wilhelm reiterates that "the Statement is [not] false" and "provides only that Mr. Wilhelm believed the [L]etters were not written by the Citron Law Group and that pretending to be a lawyer can subject an individual to penalties." (*Id.* at 4.) Wilhelm argues that the "Statement does not state that the Letters *were not* written by an attorney," "does not state that Lucky authored the letters and impersonated an attorney," and "does not state that Lucky wrote the letters to scare anybody." (*Id.*) And Wilhelm reiterates that the Statement "merely provides Mr. Wilhelm's opinion." (*Id.*) Next, Wilhelm argues that Lucky's "attempt to distinguish *Hosszu* is unpersuasive" and that Lucky's position that "First Amendment defenses are not proper at this juncture . . . is wrong." (*Id.*) Wilhelm contends that *Hosszu* is analogous because "[a]lthough the Statement does implicate Lucky, if the Court construes the Statement and the entire Article to the ends of the earth, the Statement can be interpreted to merely raise a suspicion that Lucky impersonated a lawyer by writing the Letters." (*Id.* at 5.)

C.    **Analysis**

Because the parties assume that Lucky's defamation claim is governed by Arizona law (Doc. 1 ¶ 36; Doc. 11 at 8), the Court will do the same. "Arizona follows the Restatement (Second) of Torts (1977) . . . on claims relating to defamation of a private person." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App.

2015).  *See also Koepnick v. Sears Roebuck & Co.*, 762 P.2d 609, 617 (Ariz. Ct. App. 1988) ("Arizona courts follow the *Restatement (Second) of Torts* absent authority to the contrary.").  Under the Second Restatement, "[t]o create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm [*i.e.*, defamation per se] or the existence of special harm caused by the publication [*i.e.*, defamation per quod]."  Restatement (Second) of Torts § 558 (1977).

### 1.    Opinion

Wilhelm argues that the allegedly defamatory Statement—that Wilhelm "ha[d] reason to believe the[] [L]etters were not written by Beau Citron of the Citron Law Group" (Doc. 11-1 at 7)—is a statement of opinion protected by the First Amendment.

"Although defamation is primarily governed by state law, the First Amendment safeguards for freedom of speech and press limit state law."  *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).  "The scope of constitutional protection extends to statements of opinion on matters of public concern that do not contain or imply a provable factual assertion."  *Id.*  "To determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made."  *Id.*  "First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work.  Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation.  Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false."  *Id.  See also Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990).

### a.    **General Tenor Of The Work**

Although a close call, the first factor—the general tenor of the work—weighs in Wilhelm's favor.  On the one hand, the complaint alleges that Defendants "hold themselves

- 28 -

out as a source of 'armchair investigative journalists' who 'hawkishly cover any credible allegation' of abuse"; that "Wartberg [sic] Watch's blog bolsters its posts with materials such as 'court records, police reports, video clips of pastors' sermons, and emails', a methodology that is inconsistent with a platform of subjective commentary";[15] and that "Parsons has also stated that she 'never lie[s] when [she's] writing these blogs' and is 'dead serious about what [she] write[s],' reinforcing the intent to present factual information to the public." (Doc. 1 ¶ 17.)  At first blush, these allegations suggest that the general tenor of the Wartburg Watch is to report objective facts.  On the other hand, the complaint itself states that the Wartburg Watch is a blog that reports news *and provides commentary* on that news.  (Doc. 1 ¶ 16, emphasis added [alleging that the "Wartburg Watch's *blog* purports to offer *commentary* and news on various religious and social topics"].)  Courts within the Ninth Circuit have frequently held that blogs are "a form of media known for containing personal opinion and commentary." *Hosszu*, 202 F. Supp. 3d at 1107.  *See also Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2013 WL 3460707, *4 (N.D. Cal. 2013) (statements made on personal blogs "are less likely to [be] view[ed] [by readers] as assertions of fact"); *Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1223 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir.2014) ("[B]logs are a subspecies of online speech which inherently suggest that statements made there are not likely provable assertions of fact.").  Thus, the general tenor of the Wartburg Watch, a blog that provides commentary, negates the impression that Wilhelm was asserting an objective fact.

### b.    **Figurative Or Hyperbolic Language**

"Wilhelm does not contest that the Article, nor the Statement, did not include hyperbolic or figurative speech." (Doc. 11 at 7.)  Accordingly, this factor weighs in favor

---

[15]    The Court also disagrees that bolstering blog posts with sources is "a methodology that is inconsistent with a platform of subjective commentary," as the complaint contends. (Doc. 1 ¶ 17.)  The Ninth Circuit has held that "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995).

- 29 -

of Lucky.[16]

c.    **Susceptible Of Being Proved True Or False**

Wilhelm argues that the Statement cannot be proved true or false "because it is [his] personal opinion" and "merely recited [his] personal perspective and belief that the Letters were not sent by Beau Citron." (Doc. 11 at 7.) To the extent Wilhelm is arguing that, by couching the Statement with the language "I have reason to believe," the Statement is therefore a non-actionable opinion, that argument is without merit. Courts have repeatedly held that the use of such prefatory language does not transform an otherwise false statement of fact into a non-actionable opinion. *See, e.g.*, *Berris v. Choi*, 2025 WL 2548743, *13 (S.D.N.Y. 2025) ("Similarly, 'we have reasons to believe that [Berris] may be defrauding the company' has a precise meaning, can be proven untrue by showing that Choi had no reason to believe Berris was defrauding the company, and the surrounding circumstances— an employer stating to outside counsel that they have reason to believe that a former employee was engaged in fraud—would signal fact, not opinion."); *McKnight v. McKnight*, 2021 WL 4133970, *5 (D. Ariz. 2021) (prefacing challenged statement with "I caught wind" did not "prevent the [s]tatement from being 'provably false'" because "'I caught wind' would communicate to a reasonable viewer that the rest of Defendant's statement was the repetition of an actual or manufactured rumor," and thus "adding the phrase 'I

---

[16]    Wilhelm argues that, in *Hosszu*, "the court gave no weight to this factor in determining that the article was protected speech," and thus, the fact that Wilhelm concedes that the Article lacks hyperbolic/figurative language "is immaterial to the determination of whether the Statement is actionable defamation." (Doc. 11 at 6-7.) The Court disagrees with Wilhelm's interpretation of *Hosszu*. Nowhere did the district court in *Hosszu* state, much less suggest, that it gave the second factor "no weight." The district court weighed all three factors in *Hosszu* before concluding that the statements at issue were protected opinion. 202 F. Supp. 3d at 1108 ("*For all of the above reasons*, Barrett's statements in the May 20th article are protected by the First Amendment.") (emphasis added). *See also id.* at 1105 (in considering "whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact . . . [c]ourts should consider the 'totality of the circumstances'") (cleaned up). At any rate, in affirming, the Ninth Circuit devoted an entire paragraph to the use of figurative or hyperbolic language in the article at issue. 716 F. App'x at 624.

caught wind' did nothing to shield Defendant from potential liability"); *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1058 (N.D. Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015) ("[T]he fact that the alleged communications at issue are prefaced with the word 'may' or the phrase 'has every reason to believe' does not render them non-actionable opinions. Prefatory language does not control whether a statement is defamatory.") (cleaned up).

Moreover, even if the assertion "I have reason to believe these [L]etters were not written by Beau Citron of the Citron Law Group" were considered opinion, that assertion is still potentially defamatory to the extent it implies a false assertion of objective fact. "Even in contexts in which the general tenor of the work suggests that the author is expressing personal opinions, it is possible that a particular statement of opinion may imply a false assertion of objective fact and therefore fall outside the scope of the First Amendment's protection . . . ." *Partington*, 56 F.3d at 1155. "The courts of appeals that have considered defamation claims . . . have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." *Id.* at 1156. Thus, the Ninth Circuit has held that "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Id.* at 1156-57.

The Restatement (Second) of Torts § 566 is instructive on this point. Section 566 explains that "a statement in the form of an opinion . . . is actionable . . . if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Id.* This doctrine

> derives from the statement's effect on the reader. If an expression of opinion follows from nondefamatory facts that are either stated or assumed, the reader is likely to take the opinion for what it is. Indeed, the reader is free to form another, perhaps contradictory opinion from the same facts. *But when the opinion derives from unstated or unassumed facts, the reader can only presume that the publisher of the statement is asserting the facts to support the opinion as well.* Thus, the effect is the same as if the unstated facts were specified, and the publisher risks liability if they are defamatory.

*Lewis v. Time, Inc.*, 710 F.2d 549, 555 (9th Cir. 1983) (emphasis added) (citations omitted).

Here, a reasonable factfinder could construe the Statement as expressing an opinion derived from an unstated fact, *i.e.*, that the Letters were not, in fact, written by Beau Citron, and presume that Wilhelm was asserting that fact to support his opinion.[17] Thus, the analysis turns on whether Wilhelm provided the *basis* for his conclusion that the Letters were not written by Beau Citron. Although Wilhelm attached the Letters to the Article (Doc. 11-1 at 8-9), he provided no factual basis for why he had reason to believe they were not written by Beau Citron.[18] Indeed, in the comment section to the Article, one reader commented "Are you at liberty to discuss why you have reason to believe these letters were not written by Beau Citron of the Citron Law Group?," to which Wilhelm responded "I believe it would be in my best interest to not state my reasons at this time." (Doc. 11-1 at 10.) The Court's analysis of a similar issue in *McKnight* is instructive here:

> The Second Restatement's illustrations in § 566, in which an author writes to a third party about his neighbor, help explain why Defendant's Statement may be premised on undisclosed facts. In one scenario, the author simply writes, "I think he must be an alcoholic." The Second Restatement explains that "[a] jury might find that this was not just an expression of opinion but that it implied that [author] knew undisclosed facts that might justify his opinion." In a contrasting scenario, the author writes, "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic." The Second Restatement explains that, because "[t]he statement indicates the facts on which the expression of opinion was based

[17] To the extent Wilhelm is arguing that whether Beau Citron wrote the Letters cannot be proved true or false because Beau Citron's contact information was not provided on the Letters, that argument is without merit. Beau Citron's authorship of the Letters can be proved true or false through a variety of means, such as by comparing them to other letters written by Beau Citron, analyzing the metadata associated with the Letters, or perhaps simply finding Beau Citron and asking him if he wrote the Letters. This is in contrast to *Hosszu*, in which the Ninth Circuit emphasized that "there is no available, reliable means to definitively confirm PED use." 716 F. App'x at 622, 624.

[18] In contrast, Wilhelm did include a screenshot of the research he performed to reach the conclusion that "pretending to be a lawyer to scare someone into compliance can be subject to both criminal and civil penalties." (Doc. 11-1 at 7, 10.)

and does not imply others," the author cannot be "liable for defamation." *McKnight*, 2021 WL 4133970 at *6 (cleaned up).  This case resembles the former scenario.  In the Article, Wilhelm provides no facts to support why he believes the Letters were not written by Beau Citron.  *Cf. Manufactured Home Communities Inc. v. Cnty. of San Diego*, 544 F.3d 959, 965 (9th Cir. 2008) ("[W]e leave it to the jury to determine whether Jacob's statements were opinions based upon express facts.  A reasonable juror could conclude that Jacob did not outline the facts available to her sufficient to make it clear that the challenged statements represent her own interpretation of express facts.  Here, Jacob's statements were not clearly attached to such an outline of fact, nor did she explicitly link her statements to an express factual basis.  Accordingly, . . . a reasonable listener could conclude that Jacob implied there are other, unstated facts supporting her comments.") (cleaned up).

Wilhelm's belated attempt to use his motion to dismiss as a vehicle for providing this explanation is unavailing.  In his motion, Wilhelm indicates that the reason he believes the Letters were not written by Beau Citron is "because the Letters did not include an email address for Citron Law Group or Beau Citron, a physical address, phone numbers, fax numbers, or an attorney State Bar number for Mr. Citron, and were written in a manner Mr. Wilhelm expected an attorney to write." (Doc. 11 at 7.)  Wilhelm also argues that he "research[ed] the return address for the Letters" and "not a single search result related to Citron Law Group or Beau Citron." (*Id.* at 8.)  But these facts don't appear in the Article alongside the Statement.[19]

### d.   Summary As To Opinion Factors

For these reasons, the Court concludes that the Statement could be reasonably construed as implying a false assertion of objective fact.  Thus, Wilhelm is not entitled to dismissal on First Amendment grounds at the motion-to-dismiss stage.[20]

---

[19]    In his motion, Wilhelm also points to comments made by others which state, among other things "the fact there is no contract info [on the Letter] is my first red flag that this is not an official letter." (Doc. 11 at 7, citing Doc. 11-1 at 11.)  But that is a reason given by someone else and was not supplied until after the Statement was made.

[20]    *Hosszu*, relied upon at length by Wilhelm, is distinguishable.  There, Hosszu alleged

- 33 -

2.     Identification

"To be actionable as a matter of law, defamatory statements must be published in such a manner that they reasonably relate to specific individuals. While the individual need not be named, the burden rests on the plaintiff to show that the publication was of and concerning him." *Hansell v. Stoll*, 636 P.2d 1236, 1240 (Ariz. Ct. App. 1981) (cleaned up). A plaintiff need not prove that "every reader could make the connection, as publication to any individuals will suffice. But the [reader's identification of the plaintiff] must be reasonable under the circumstances." *Id.* (citation omitted). "Extrinsic facts may make it clear that a statement refers to a particular individual although the language appears to defame nobody. . . . [T]he defamer is subject to liability if he knew that the communication would be understood by the recipient to refer to the plaintiff or was negligent in failing to recognize that this may happen." Restatement (Second) of Torts § 564, cmts. b, f. Once a plaintiff meets this burden, "[t]he question of identification is for the jury to decide." *Hansell*, 636 P.2d at 1241.

Here, the Statement was published in a manner that reasonably related to Lucky. The Statement reads:

Below you will see two [L]etters I received allegedly from Citron Law Group

---

that Barrett published an article that contained "false 'assertions of fact' which accuse[d] [Hosszu] of using performance-enhancing drugs to achieve her success." 202 F. Supp. 3d at 1104. The court emphasized that "[w]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Id.* at 1105 (citation omitted). In holding that Barrett's article did not imply an assertion of objective fact, the court noted that (1) "Barrett stated in the first sentence of the May 20th article that 'there is no proof' that Hosszu is aiding her performances with drugs"; (2) "Barrett based his conclusion on facts about Hosszu's recent achievements, her unusual ability to recover in between races, and her body type changes," thus "outlin[ing] the facts available to him, and Hosszu does not dispute the truth of those facts"; and (3) "Barrett conceded that his suspicions about Hosszu could be wrong, and stated that he hopes they are," "[b]ut then he provided a few more facts to support his suspicions." *Id.* at 1105-06. In contrast, and as detailed above, Wilhelm did not provide any facts or explanation to support his conclusion that the Letters were not written by Beau Citron (other than attaching the Letters themselves).

> PLLC on behalf of Larry Lucky.  I have reason to believe these letters were not written by Beau Citron of the Citron Law Group.  When researching this matter I found that "pretending to be a lawyer to scare someone into compliance can be subject to both criminal and civil penalties."

(Doc. 11-1 at 7.)  This Statement was made in an Article entirely about Lucky and Lucky's alleged inappropriate encounters with minors.  Although the Statement does not state outright that Wilhelm believes Lucky wrote the Letters, that is the only logical implication.  The Statement clearly implies that the Letters allegedly sent on behalf of Lucky by Citron Law Group were actually sent by Lucky "pretending to be a lawyer to scare" Wilhelm into taking down social media posts regarding Lucky's allegedly inappropriate behavior.  Indeed, Wilhelm appears to tacitly admit as much in his reply brief.  (Doc. 19 at 5 ["Although the Statement does implicate Lucky, if the Court construes the Statement and the entire Article to the ends of the earth, the Statement can be interpreted to merely raise a suspicion that Lucky impersonated a lawyer by writing the Letters."].)  Thus, Lucky has met his burden at this stage of showing that the Statement reasonably relates to him.

III.    Leave To Amend

Although "[i]t is unclear whether the Court must assess the possibility of leave to amend in connection with a motion to dismiss under Rule 12(b)(2)," *Driscoll v. JEF Invs. LLC*, 2025 WL 3513888, *4 n.3 (D. Ariz. 2025), "[c]ourts have more often than not granted leave to amend after granting a motion to dismiss on 12(b)(2) grounds," *Prime Healthcare Servs., Inc. v. Emblemhealth, Inc.*, 2016 WL 11771246, *4 (C.D. Cal. 2016).  Thus, consistent with Rule 15(a)(2)'s textual mandate to "freely give leave" to amend and the Ninth Circuit's exhortation to apply this mandate with "extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citation omitted), the Court will authorize Lucky to amend his complaint in an attempt to add new factual allegations sufficient to establish personal jurisdiction over Parsons.  *See also Beauchamp v. Flaherty*, 2024 WL 4475089, *2 (D. Ariz. 2024) (granting leave to amend following grant of Rule 12(b)(2) motion to dismiss); *State Narrow Fabrics, Inc. v. Fisher*, 2016 WL 11002147, *6 (C.D. Cal. 2016) ("Case law is not definitive how whether motions under

Rule 12(b)(2) should be granted with leave to amend.  However, some supporting case law does exist.").

Accordingly,

**IT IS ORDERED** that:

1. Parsons's motion to dismiss (Doc. 15) is **granted**.

2. Wilhelm's motion to dismiss (Doc. 11) is **denied**.

3. Lucky may file a First Amended Complaint ("FAC") within 14 days of the issuance of this order.  Any changes shall be limited to attempting to rectify the deficiencies identified in this order.  Lucky shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

Dated this 5th day of June, 2026.

Dominic W. Lanza
United States District Judge