**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Lawrence Lucky,

Plaintiff,

v.

Wartburg Watch, et al.,

Defendants.

No. CV-25-03030-PHX-DWL

**ORDER**

This is a defamation action. Plaintiff Lawrence Lucky ("Lucky") alleges that Defendant Todd Wilhelm ("Wilhelm") authored an article on a blog, the Wartburg Watch, that contained a "false and defamatory statement" that "implie[d] that [Lucky] forged an attorney's signature and impersonated a lawyer." (Doc. 39 ¶¶ 22, 27.) Also named as Defendants are the Wartburg Watch and its co-founder and active operator, Darlene Parsons ("Parsons"). (*Id.* ¶¶ 5-6.)

Now pending before the Court is a motion to dismiss filed by the Wartburg Watch and Parsons (together, "the Moving Defendants"). (Doc. 44.) For the reasons that follow, the motion is granted.

**BACKGROUND**

I. <u>Relevant Factual Allegations</u>

The following facts, presumed true, are derived from the First Amended Complaint ("FAC") (Doc. 39) and the supplement thereto (Doc. 64).

…

### A. The Parties

"Lucky is an individual and a citizen of the State of Missouri." (Doc. 39 ¶ 4.)

"The Wartburg Watch is an unincorporated association with an online presence" that is "a citizen of the State of North Carolina." (Doc. 64 ¶ 7.)

"Parsons is an individual, a citizen of the state of North Carolina, and the co-founder, active operator, and chief editor of the Wartburg Watch." (Doc. 39 ¶ 6.)

"Wilhelm is an individual, a citizen of the State of Arizona, and contributing agent and author for The Wartburg Watch." (*Id.* ¶ 7.)

### B. The Wartburg Watch and Wilhelm's Involvement With The Blog

Parsons "operates The Wartburg Watch as an interactive, curated publishing platform that she publicly holds out as an integrated, multi-state operation." (*Id.* ¶ 10.)

Parsons "actively recruited Arizona resident [Wilhelm] to author content for the Wartburg Watch." (*Id.* ¶ 11.) Wilhelm publicly announced that "he was shutting down his own independent publication," saying, "Dee Parsons, the well-known author of the Wartburg Watch, has kindly offered to let me write on her blog." (*Id.*) According to Wilhelm, "what convinced him to accept [Parsons's offer] was that he '[would] not be expected to write any specific number of articles.'" (*Id.*)

"The Wartburg Watch's official operating rules mandate a formalized pipeline requiring all guest posters to submit articles directly to the owners 'for [their] consideration,'" and Parsons has "publicly declar[ed]: 'In the end, it is our blog. We take the hits and we pay the bills.'" (*Id.* ¶ 12.) Once, in relation to an article concerning the "9Marx Toolkit," "Wilhelm publicly deferred to Parsons to verify material facts, and she provided confirmation." (*Id.* ¶ 13.)

"Parsons and Wilhelm also maintained a coordinated practice on X in which Parsons regularly reposted Wilhelm's posts and tagged him in her promotional posts for The Wartburg Watch." (*Id.*) Wilhelm "prominently displays his Casa Grande, Arizona location alongside The Wartburg Watch branding on his professional social media profile using the identical format employed by Parsons." (*Id.* ¶ 10.)

C. **The Article**

"On or about August 23, 2024, Defendants published an article titled, 'Former IHOPKC Musician Larry Lucky Has Larger Issues to Worry About than a Tik Tok Video Alleging Nefarious Deeds'" ("the Article"). (*Id.* ¶ 18.) "Wilhelm authored the Article in Arizona." (*Id.* ¶ 19.) "Parsons reviewed, approved, and published the Article on The Wartburg Watch." (*Id.* ¶ 20.)

The end of the Article includes the following passage:

> Below you will see two letters I received allegedly from Citron Law Group PLLC on behalf of Larry Lucky. I have reason to believe these letters were not written by Beau Citron of the Citron Law Group. When researching this matter I found that "pretending to be a lawyer to scare someone into compliance can be subject to both criminal and civil penalties."

(*Id.* ¶ 21.) These three sentences will be referred to in this order as "the Statement."

The FAC alleges that the Statement "implies that [Lucky] forged an attorney's signature and impersonated a lawyer," when in fact "Beau Citron is a licensed and practicing attorney in Arizona" who "personally authored and sent the cease-and-desist letters to [Wilhelm] on [Lucky's] behalf." (*Id.* ¶ 22-23.) "When readers asked [Wilhelm] in the comments section to substantiate his claim that the letters where forged, he refused to provide any factual basis. Instead, he implied he had personal knowledge which he could not share to back up his claims, stating: 'I believe it would be in my best interest to not state my reasons at this time.'" (*Id.* ¶ 25.)

Defendants then "continued to maintain and promote the Article." (*Id.* ¶ 26.) "Parsons reposted the Article on her personal X account" and "tagged, among others, Brent Detwiler, a minister and blogger who was then a resident of Gilbert, Arizona." (*Id.* ¶ 14.)

D. **Lucky's Harm**

The FAC alleges "Lucky has suffered and continues to suffer significant harm to his reputation, standing in the community, emotional distress, humiliation, embarrassment, and professional damage, for which he is entitled to compensatory damages in an amount in excess of $75,000.00." (*Id.* ¶ 27.) Lucky is also "being treated by both a psychologist

and psychiatrist, and has been diagnosed with severe depression and Post Traumatic Stress Disorder" related to "the profound stress and fear caused by false accusations of criminal conduct." (*Id.* ¶ 29.)

Additionally, Lucky "operates American Joe Coffee, which maintains an established customer base and active sales in Arizona municipalities, including Goodyear, San Tan Valley, and Scottsdale," and "maintains personal and community ties in the state, including family leadership within a Glendale, Arizona church pastored by his cousin, Lawrence Cole." (*Id.* ¶ 15.)

II. Relevant Procedural Background

On August 21, 2025, Lucky initiated this action by filing the complaint. (Doc. 1.) Afterward, Wilhelm filed a motion to dismiss (Doc. 11), Parsons filed a motion to dismiss (Doc. 15), and the Wartburg Watch filed an answer (Doc. 16).

On June 5, 2026, the Court denied Wilhelm's motion to dismiss and granted Parsons's motion to dismiss for lack of personal jurisdiction. (Doc. 36.) The dismissal of Parsons was with leave to amend. (*Id.* at 35.)

On June 26, 2026, Lucky filed the FAC.[1] (Doc. 39.)

On July 31, 2026, the Moving Defendants filed the pending motion to dismiss. (Doc. 44.) The motion is now fully briefed (Docs. 47, 50) and no party requested oral argument.

On November 16, 2026, the Court authorized Lucky to file a supplement to the FAC to allege the Wartburg Watch's state of citizenship. (Doc. 63.)

On November 17, 2026, Lucky filed the supplement. (Doc. 64.)

…

---

[1] The scope of leave to amend authorized by the June 5, 2026 order was limited to "add[ing] new factual allegations sufficient to establish personal jurisdiction over Parsons." (Doc. 36 at 35.) The FAC disregards this limitation—among other things, it includes new factual allegations regarding economic damages (*compare* Doc. 1 ¶¶ 39-42 *with* Doc. 39 ¶ 36), removes the previous Count Two for injunctive relief (*compare* Doc. 1 ¶ 44-47 *with* Doc. 39 at 8), and omits the Wartburg Watch's state citizenship (*compare* Doc. 1 ¶ 2 *with* Doc. 39 ¶ 5). Nevertheless, because no Defendant has sought to challenge these unauthorized amendments, the Court considers the amended pleading as filed.

## DISCUSSION

I. Parsons's Motion to Dismiss

Parsons moves to dismiss pursuant to Rules 12(b)(2) and 12(b)(6). (Doc. 44.) Because, as discussed below, the Court still lacks personal jurisdiction over Parsons, it is unnecessary to address Parsons's Rule 12(b)(6) arguments.

A. **Legal Standard**

A defendant may move to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike*, Inc., 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* (cleaned up).

When ruling on a motion to dismiss for lack of personal jurisdiction, "uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor," but a "plaintiff may not simply rest on the bare allegations of the complaint." *Id.* (cleaned up). The Court may also consider "deposition testimony and other evidence" outside of the pleadings to determine whether it has personal jurisdiction. *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995). *See also Lee v. Plex, Inc*., 773 F. Supp. 3d 755, 769 (N.D. Cal. 2025) ("The court may also consider declarations and other evidence outside the pleadings to determine whether it has personal jurisdiction.") (cleaned up); 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, § 12:31 (June 2026 Update) ("The plaintiff must supply specific facts in support of personal jurisdiction.").

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Morrill v. Scott Fin. Corp*., 873 F.3d 1136, 1141 (9th Cir. 2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)). "Arizona law permits the exercise of personal jurisdiction to the extent permitted under the United States

Constitution." *Id.* (citing Ariz. R. Civ. P. 4.2(a).) Accordingly, whether the Court has personal jurisdiction over Parsons "is subject to the terms of the Due Process Clause of the Fourteenth Amendment." *Id.*

"Constitutional due process requires that defendants have certain minimum contacts with a forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (cleaned up). Minimum contacts exist "if the defendant has continuous and systematic general business contacts with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Id.* at 1142 (cleaned up).

Lucky does not contend that Parsons is subject to general personal jurisdiction in Arizona. Thus, the Court must apply the Ninth Circuit's three-prong test to determine whether Parsons has sufficient contacts with Arizona to be subject to specific personal jurisdiction: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Morrill*, 873 F.3d at 1142 (citation omitted). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (citation omitted). "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* (citation omitted).

B. **The Parties' Arguments**

The Moving Defendants contend that the FAC merely "re-labels the very facts this Court already held insufficient—that Parsons operates a blog that can be read in Arizona, that a contributor to that blog happens to live in Arizona, and that Parsons has some editorial role at the blog—and dresses them in the same conclusory language the Court has

already rejected." (Doc. 44 at 1-2.) They assert that "[t]he handful of genuinely new allegations are legal conclusions, are contradicted by the exhibits [Lucky] himself attached, or concern the forum contacts of people other than Parsons." (*Id.* at 2.) For example, the Moving Defendants contend that "this Court already rejected as conclusory" Lucky's assertion that "Parsons had 'substantial control' over 'any Wartburg Watch contributor, much less Wilhelm.'" (*Id.* at 5.) Additionally, the Moving Defendants contend that "neither Lucky nor Parsons's declaration shows that Parsons screens articles by *other* individuals," and even if Parsons did "in fact review[] the article at issue, this Court already explained that would not demonstrate that Parsons exercised 'substantial control' over Wilhem." (*Id.* at 6.) Next, the Moving Defendants argue that even "assuming it was true" that "Parsons 'solicited' Wilhelm to avail herself of Arizona," the "mere fact that Parsons allegedly asked Wilhelm to post on the blog does not show she has substantial control over his work." (*Id.*) The Moving Defendants also contend "[t]here is no allegation that Parsons asked Wilhelm to cover Arizona stories or otherwise use his connection to Arizona in any way on behalf of the Wartburg Watch." (*Id.* at 6-7.) The Moving Defendants further assert that although the "FAC alleges that Parsons . . . reached out to Arizona citizens herself" by tagging an Arizona resident on X, this "is directly contradicted by Exhibit E to the FAC," which shows that Parsons "in no way altered the [original post] and that she did not tag any Arizona citizens, as the tags were part of the original message that Wilhelm posted." (*Id.*) Finally, the Moving Defendants argue that "[e]ven if Parsons somehow had purposefully directed conduct into Arizona," personal jurisdiction still cannot be established because (1) "there is no allegation that Parsons committed an *intentional* act"; (2) "there is no allegation that Parsons in fact caused any harm in Arizona"; and (3) "there is no allegation that Parsons *knew* that the harm was likely to be suffered in Arizona." (*Id.* at 7-8.)

In response, Lucky argues that although the Court previously "held that a blog readable in all fifty states is not, without more, expressly aimed at any one of them, and that the [original] complaint alleged no 'conduct directly targeting the forum,'" the FAC

addresses those deficiencies.[2] (Doc. 47 at 5.) First, Lucky argues that Parsons directed her own conduct at Arizona because she "recruited an Arizona resident" whose "Arizona residence and Arizona vantage point" were things Parsons sought. (*Id.* at 9.) Lckcy contends that Parsons also exhibited an intent to reach an Arizona audience because "she cultivated a standing Arizona contributor whose Arizona location she and he displayed publicly alongside the publication's branding." (*Id.*) Lucky emphasizes an excerpt from Parsons's article announcing Wilhelm's arrival, where she wrote "of checking 'what time it is in Arizona' in coordinating" with Wilhelm,[3] and he contends this passage shows that Parsons was not merely "passively accessible to" Arizona. (*Id.*) Second, Lucky argues that the Wartburg Watch's operating rule that "submissions by others are routed to the owners, who decide whether they run" and the website's announcement that the owners take liability for everything published "told the world [Parsons] possesses the authority" necessary to demonstrate substantial control over an agent as required by *Williams v. Yamaha Motor Co*., 851 F.3d 1015 (9th Cir. 2017). (*Id.* at 6-7.) Lucky further contends that because Parsons once "exercised editorial authority over Wilhelm's factual assertions," Parsons had control over Wilhelm's work "on an identified occasion, in a manner both parties treated as routine." (*Id.* at 7.) Lucky also disputes the Moving Defendants' contention that the Court previously rejected the notion that substantial control can be demonstrated by allegations that "Parsons reviewed, approved, and published [the] Article on The Wartburg Watch." (*Id.*) On the contrary, Lucky argues that although the Court noted that the previous allegations were "ambiguous as to whose articles Parsons

---

[2] Lucky also disputes the Moving Defendants' reliance on Parsons's declaration, which was filed "eleven months ago in support of a motion directed at a superseded pleading," and their assertion that the declaration is "unrebutted." (*Id.* at 3-4.) In support, Lucky attaches his own declaration to fill in some gaps "Defendants say are missing." (*Id.* at 3-4; *see* Doc. 48.) In it, Lucky adds allegations related to Wilhelm's relationship to the Wartburg Watch, including an allegation that "Wilhelm has authored more than 130 articles published on The Wartburg Watch from Arizona." (Doc. 47 at 6; Doc. 48 ¶ 7).

[3] Lucky asserts that this quoted language appears in the article enclosed as Exhibit B to his declaration. (Doc. 47 at 9; Doc. 48 ¶ 6.) As far as the Court can tell, the quoted language does not appear in that article. (Doc. 48 at 16-18.) The Moving Defendants note this omission in their reply but clarify that "Parsons does not dispute that the language is present on the actual blog post, which was not produced in full." (Doc. 50 at 4 n.2.)

screened," this was simply an "observation about an evidentiary gap," not a holding that "screening another's article is legally irrelevant to control." (*Id.* at 7-8.) With regard to Wilhelm's social media profile, Lucky contends that "[a] publication that maintains and promotes a publicly branded Arizona presence has done 'something more' than sit passively on the internet." (*Id.* at 8.) As for the X post, Lucky contends it is irrelevant that Parsons did not author the post because "one who repeats a defamatory statement is subject to liability as though she had originated it." (*Id.* at 10, 12 [citing Restatement (Second) of Torts § 578].) Finally, Lucky contends that the rest of the test for specific personal jurisdiction is satisfied because Parsons (1) acted intentionally by "[r]ecruiting a contributor, maintaining a submissions gate, reviewing and approving an article, publishing it, and then republishing it on a second platform"; (2) caused harm in the forum because he has a coffee business that ships to Arizona cities, had to hire Arizona attorneys, and has family ties in Arizona; and (3) knew the harm would be felt in Arizona because she "knew the Statement accused someone of forging correspondence from an Arizona law firm and impersonating an Arizona-licensed attorney, and she knew" the cease-and-desist letters were "addressed to an Arizona recipient." (*Id.* at 13-14.)

In reply, the Moving Defendants assert that Lucky "has filed two separate complaints and two separate declarations, none of which demonstrate that Parsons could be subject to personal jurisdiction in this Court." (Doc. 50 at 1.) According to the Moving Defendants, Lucky's arguments "do not adequately address the Court's concerns" and erroneously "treat[] this Court's ruling as having conclusively determined that an agency theory could apply to personal jurisdiction"—even though the Court only assumed as much "for the sake of argument." (*Id.* at 2.) The Moving Defendants contend that Lucky "did not and cannot address the fact that Parsons is not paid for her work and that the website has no income whatsoever," which "means that the website is passive" and that "Parsons does not receive *any* benefit from Arizona, even if she did somehow reach into it." (*Id.* at 3-4.) Regardless, the Moving Defendants contend that Lucky's argument that Wilhelm's posting of "articles on the blog proves Parsons purposefully directed activity into Arizona

because Parsons allegedly sought him out" is "just an end run around agency theory" and is not enough to show that Parsons herself reached into Arizona. (*Id.* at 4.) The Moving Defendants also emphasize that there is no allegation that Parsons recruited Wilhelm "for any Arizona-related activity," and the fact that "Wilhelm lists Arizona on his personal X account" changes nothing because "this Court previously rejected Plaintiff's arguments that Wilhelm's residence is enough to confer jurisdiction over Parsons." (*Id.*) Next, the Moving Defendants contend that "generalized statements that the Wartburg Watch has 'rules' regarding consideration of articles does not demonstrate that Parsons specifically applied those rules to Wilhelm's articles. And here, the Declarations show that Parsons had come to a specific arrangement with Wilhelm where she did not do so." (*Id.* at 5.) As for the statement "'[w]e take the hits and pay the bills," the Moving Defendants contend it "does not show that Parsons exercised any control over Wilhelm," and "a single prior instance of *after-the-fact* 'verification' of an article based on public request" is "hardly editorial control or a verification of authenticity." (*Id.* at 6-7.) Finally, the Moving Defendants reiterate that the remaining requirements for specific personal jurisdiction over Parsons also cannot be established. (*Id.* at 7.)

C. **Analysis**

Defamation is an "intentional tort." *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 603 (9th Cir. 2018). "A purposeful direction analysis applies in suits sounding in tort where the tort was committed outside the forum state." *Id.* at 605.[4] The "effects test" from *Calder v. Jones,* 465 U.S. 783 (1984), "is normally employed in purposeful direction cases." *Yahoo! Inc. v. Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). The Ninth Circuit "construe[s] *Calder* to impose three requirements: the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (cleaned up).

---

4 As before, it is undisputed that Parsons's alleged conduct occurred in North Carolina, where she operates the Wartburg Watch and publishes articles.

In the June 5, 2026 order, the Court held that Lucky had not shown that Parsons expressly aimed any of her conduct at Arizona, which meant he had not shown purposeful direction under *Calder*. The Court also held that, even assuming the Ninth Circuit recognizes an agency theory of personal jurisdiction, Lucky had not alleged that Parsons had "substantial control" over Wilhelm sufficient to establish such a theory.

As far as the Court can tell, the new allegations in the FAC intended to address these deficiencies (many of which replace allegations in the original complaint) are: (1) Parsons "established an intentional relationship with [Arizona] by actively soliciting and recruiting [Wilhelm], an Arizona resident, to author content for her platform" (Doc. 39 ¶¶ 3, 11); (2) Parsons "reviewed, approved, and published the Article on [t]he Wartburg Watch" (*id.* ¶ 20); (3) Parsons maintains a "public-facing operational arm in Arizona" because Wilhelm "prominently displays his Casa Grande, Arizona location alongside [t]he Wartburg Watch branding on his professional social media profile using the identical format employed by Parsons herself" (*id.* ¶ 10); (4) the Wartburg Watch's "official operating rules mandate a formalized pipeline requiring all guest posters to submit articles directly to the owners 'for [their] consideration'" and Parsons "publicly declar[ed]: 'In the end, it is our blog. We take the hits and we pay the bills'" (*id.* ¶ 12); (5) on at least one occasion, "Wilhelm publicly sought editorial oversight from [Parsons] on factual claims in his articles" (*id.* ¶ 13); (6) Parsons reposted Wilhelm's X post about the Article, which "tagged, among others, Brent Detwiler, a minister and blogger who was then a resident of Gilbert, Arizona" (*id.* ¶ 14); and (7) Lucky operates a coffee chain with "an established customer base and active sales in Arizona municipalities," "maintains personal and community ties in the state," and "maintains ongoing professional relationships with multiple Arizona attorneys" (*id.* ¶ 15-16). As explained below, the Court agrees with the Moving Defendants that these new allegations remain insufficient to establish personal jurisdiction over Parsons.

1. Express Aiming

The Court previously found that the allegations in the complaint established that "the Wartburg Watch is a passive website" (Doc. 36 at 16), and the FAC adds no allegations

to the contrary. "It is well settled that mere passive operation of a website is insufficient to demonstrate express aiming." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023) (cleaned up). "But operating a website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient to satisfy the express aiming prong." *Id.* at 1092 (cleaned up). "When the website itself is the *only* jurisdictional contact, our analysis turns on whether the site had a forum-specific focus or the defendant exhibited an intent to cultivate an audience in the forum." *Id.*

In an effort to establish "something more," the FAC alleges that Parsons recruited Wilhelm with knowledge that he was an Arizona resident. (Doc. 39 ¶¶ 3, 11.) According to Lucky, this shows that Parsons sought his "Arizona vantage point." (Doc. 47 at 9.) Lucky also contends their relationship is "continuing, rather than a single transaction," due to her oversight over his articles, her promotion of his articles on X, and his publication "under her banner," which shows that Parsons "exhibited an intent to cultivate an audience in the forum" under *Herbal Brands* because she "cultivated more than an audience: she cultivated a standing Arizona contributor whose Arizona location she and he displayed publicly alongside the publication's branding."[5] (*Id.*) Lucky also contends that Parsons targeted Arizona because she published the Statement on the Wartburg Watch, which is read by "Wilhelm's Arizona readership," and then "push[ed] it a second time on X," by reposting Wilhelm's post that tagged an Arizona resident.[6] (*Id.*)

---

[5] The Court notes that the FAC, its supporting exhibits, and Lucky's declaration all allege that *Wilhelm* publicly displays his location as Casa Grande, Arizona—they do not allege that *Parsons* displays an Arizona notation anywhere on her profile or articles.

[6] Lucky additionally argues "the actionable speech is itself Arizona-facing" because the Statement relates to letters sent by Arizona attorneys to an Arizona address. (Doc. 47 at 10.) This is not a new allegation. (*See generally* Doc. 36.) Nevertheless, Lucky asserts that although the Court previously addressed "whether 'the Article' was focused on Arizona and concluded that its relationship to the forum was 'tenuous,'" the proper analysis would address only "the Statement" which is Arizona-facing. (Doc. 47 at 10.) This argument mischaracterizes the June 5, 2026 order, which explained that the discussion in the Article of the cease-and-desist letter (also known as the Statement) "is made in reference to the lengthy discussion that precedes it regarding Lucky's alleged misconduct in Missouri" and therefore, "any relationship to Arizona is tenuous at best and does not support that the Article is somehow *focused* on Arizona." (Doc. 36 at 22.) In any event, Lucky's argument still fails because the Statement itself, by its terms, makes no reference to Arizona. That the letters were sent by an Arizona lawyer to an Arizona resident are facts about the letters—they do not make Arizona the focal point of the Statement, nor do they

Even accepting all of these allegations as true, they do not cure the deficiencies identified in the June 5, 2026 order—the FAC still "does not allege . . . that the Wartburg Watch specifically encourages Arizona readers to visit the blog or that the Wartburg Watch is involved in any commercial activity in Arizona." (Doc. 36 at 17.) Just as before, "there is no evidence that Parsons, through the Wartburg Watch, does business in Arizona." (*Id.* at 18.) Indeed, Parsons recruiting an Arizona resident is a contact with Wilhelm, not with Arizona. Personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 284 (internal citations omitted). The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285. Although Lucky asserts in his response brief that Parsons sought Wilhelm's "Arizona vantage point" when she recruited him, the FAC alleges no facts to support this. (*See generally* Doc. 39.) The FAC does not allege, for example, that Parsons wanted an Arizona audience, Arizona sources, or Arizona content for her blog. It simply alleges that she extended what seems to be an open-ended invitation to a writer who happened to live in Arizona. The FAC acknowledges that Wilhelm would "not be expected to write any specific number of articles" (Doc. 39 ¶ 11), and there is no allegation in the FAC that Wilhelm was expected to write Arizona-specific articles.

As for the alleged "operational arm" that Parsons maintains in Arizona, this is nothing more than Wilhelm's own X profile and is based on Wilhelm's own formatting choices. (*Id.* ¶ 10.) In the very same paragraph of the FAC where Lucky describes this "operational arm," he concedes that *Parsons's* editorial hub is Raleigh, North Carolina—nothing in the FAC alleges that *Parsons's* social media profile references Arizona. (*Id.*) Parsons's contacts cannot be manufactured by what a third party chooses to post about himself online. *See generally Walden,* 571 U.S. at 284-85.

Nor does Parsons's repost of an X post that tagged one Arizona resident establish

---

in any way demonstrate *Parsons's* contacts with Arizona as a forum. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("[T]he plaintiff cannot be the only link between the defendant and the forum.").

aiming at Arizona.[7] The Court previously explained that Parsons's original publication of the Statement, via the Wartburg Watch, is not enough to subject her to personal jurisdiction in Arizona. (Doc. 36 at 15.) This time, Lucky argues that "the jurisdictionally significant act is Parsons's decision to transmit content a second time . . . to an Arizona recipient." (Doc. 47 at 12.) But as the Court previously noted, "[n]ot all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every state in which it is accessed." (Doc. 36 at 14, cleaned up.) The FAC does not allege that Parsons knew Detwiler lived in Arizona or that she reposted the post tagging him because she thought it would help her reach a specifically Arizonan audience.

2. Agency Theory

Even assuming the Ninth Circuit allows personal jurisdiction to be established under an agency theory, the FAC's allegations remain insufficient to prevail under that theory. As previously discussed, "it's unclear whether the Ninth Circuit recognizes an agency test in the context of specific personal jurisdiction." (Doc. 36 at 19.) "Historically, the Ninth Circuit used an agency test to determine personal jurisdiction. Under that test, a subsidiary's contacts with a forum jurisdiction could be attributed to a parent corporation if the subsidiary performed functions sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Luna v. Taurus Int'l Mfg. Inc.*, 2025 WL 2676084, *6 (D. Ariz. 2025) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001)). The Supreme Court later "rejected this agency test as applied to general jurisdiction" but "left open the possibility that agency relationships may be relevant to the existence of specific jurisdiction." *Id.* (cleaned up). Then, in 2017, the Ninth Circuit in *Williams* held that the Supreme Court's decision was "irreconcilable" with the agency test previously used by the Ninth Circuit. *Luna*, 2025 WL 2676084 at *6. The Ninth Circuit

---

[7] Although the FAC alleges that Parsons tagged "Arizona-based individuals" (Doc. 39 ¶ 2), the only named individual with Arizona ties that Parsons is alleged to have tagged is Brent Detwiler, who was tagged "among others" whose locations are apparently unknown (*id.* ¶¶ 14, 24, 34).

"then assumed, without deciding, that some standard of agency continues to be relevant to the existence of specific jurisdiction but nonetheless found that specific jurisdiction was lacking because under any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities, and appellants neither alleged nor otherwise showed that the parent company had such control." *Id.* (cleaned up).

As noted in the June 5, 2026 order, "[i]n the wake of *Williams*, district courts in the Ninth Circuit have largely followed one of two different approaches to the agency test as it applies to specific jurisdiction. First, some courts have held that a subsidiary's contacts cannot be attributed to a parent corporation under any theory of agency. Second, other courts have concluded that a subsidiary's jurisdictional contacts can be attributed to a parent corporation when the parent exercises 'substantial control' over its subsidiary." *Id.* Notably, even assuming a subsidiary's jurisdictional contacts can be attributed to a parent corporation, it is unclear whether this theory would extend beyond corporate parent-subsidiary entities to individual co-defendants (as here). (Doc. 36 at 20.) Regardless, the FAC still fails to allege that Parsons "substantially controlled" Wilhelm's activities.

First, the new allegation that Parsons "reviewed, approved, and published the Article" (Doc. 39 ¶ 20) is a conclusory allegation with no facts concerning, for example, what review Parsons conducted, when it happened, or what she may have changed. *Cf. Williams*, 851 F.3d at 1025 n.5 (holding that the "conclusory legal statement unsupported by any factual assertion" that "'Defendants . . . were the agents or employees of each other and were acting at all times within the course and scope of such agency and employment . . . and are legally responsible because of their relationship with their co-Defendants'" was insufficient to establish specific jurisdiction under an agency theory because there were no factual allegations of "control") (alterations in original). This allegation is also contradicted by Parsons's assertion in her declaration that neither she nor anyone else from the blog supervises Wilhelm or "screen[s] or otherwise approve[s] any material" he publishes. (Doc. 36 at 21; Doc. 15-2 ¶¶ 12.) Because Lucky has not come forward with evidence controverting Parsons's sworn avowal on that point—his declaration, although

wide-ranging, does not purport to show that Parsons exercised editorial control over the Article—the Court need not accept any conflicting allegations in the FAC. *See generally LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) ("In reviewing a district court's decision on a motion to dismiss for lack of personal jurisdiction, . . . we cannot assume the truth of allegations in a pleading which are contradicted by affidavit. . . . The record before us is not comprised solely of Plaintiffs' complaint. Rather, Continental attached a declaration to its motion to dismiss, and Textron attached an affidavit to its motion to dismiss. The declaration and the affidavit contravene allegations Plaintiffs made in the complaint. If Plaintiffs had filed affidavits or declarations in response, the district court and this court would have been obligated to resolve conflicting statements in Plaintiffs' favor. But Plaintiffs filed no affidavits or declarations in response. The relevant uncontroverted record, therefore, includes Defendants' rebuttals to Plaintiffs' allegations.") (citations omitted).

This conclusion is not undermined by the FAC's allegation that the Wartburg Watch's "official operating rules mandate a formalized pipeline requiring all guest posters to submit articles directly to the owners 'for [their] consideration.'" (Doc. 39 ¶ 12.) As an initial matter, the submission rules identify the procedure for "guest posters," but the FAC does not allege that Wilhelm is a guest poster—and, given Lucky's assertions that Parsons's and Wilhelm's "arrangement was neither tentative nor peripheral" and allowed Wilhelm to "post whenever he likes" with "no set schedule" (Doc. 47 at 6; Doc. 48 ¶ 6), it does not appear that he was a guest poster. In any event, this language, at most, gives Parsons the right to *accept or decline* a submission. It does not describe control over Wilhelm's acts, such as how, when, or about what he writes. *See, e.g.*, Restatement (Third) of Agency § 1.01 (the agency relationship requires that an agent "be subject to the principal's control").

As for the statement on the website that "[i]n the end, it is our blog. We take the hits and we pay the bills" (Doc. 39 ¶ 12), those words merely connote that Parsons and her partner(s) bear the consequences and costs of running the blog—not that they exercise

editorial control over everything posted on the blog. As the Moving Defendants correctly note (Doc. 50 at 6), accepting potential responsibility for what appears on one's platform is not the same as controlling the person who wrote it. Under *Williams,* the operative question is whether the principal had the right to substantially control the agent's activities, not whether the principal bears responsibility for the results. 851 F.3d at 1024-25.

As for the allegation in the FAC that Wilhelm once "publicly sought editorial oversight from" Parsons regarding a different article by asking her to verify certain unspecified facts (Doc. 39 ¶ 13), this allegation does not, as Lucky contends, establish that such behavior was "treated as routine." (Doc. 47 at 7.) Even construed in the light most favorable to Lucky, this allegation at most shows that on one occasion Wilhelm consulted Parsons to verify a fact. Given that Lucky elsewhere contends that Wilhelm "has authored more than 130 articles published on The Wartburg Watch since 2020" (Doc. 48 ¶ 7), a one-time request to verify an already-published fact does not come close to establishing a pattern of Parsons exercising control over Wilhelm.

Finally, Parsons's "coordinated practice" of reposting Wilhelm's posts and tagging him in her promotional posts (Doc. 39 ¶ 14) is the promotion of a blog; it does not demonstrate control over what Wilhelm writes.

Accordingly, the Court continues to lack personal jurisdiction over Parsons.[8]

### D. Limited Jurisdictional Discovery

Lucky argues that if the Court concludes that personal jurisdiction is still lacking as to Parsons, "discovery should be permitted" to bring to light "pertinent jurisdictional facts" that are "almost entirely in [Parsons's] possession": "submission correspondence with Wilhelm, editorial communications about the Article, site administration records, and analytics for the X republication." (Doc. 47 at 15.)

"Jurisdictional discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of

---

[8] These conclusions render it unnecessary to address the remaining specific personal jurisdiction elements set forth in *Morrill*.

the facts is necessary." *Yamashita v. LG Chem, Ltd.,* 62 F.4th 496, 507 (9th Cir. 2023) (cleaned up). "But a mere hunch that discovery might yield jurisdictionally relevant facts, or bare allegations in the face of specific denials, are insufficient reasons for a court to grant jurisdictional discovery." *Id.* (internal citations omitted). A court may also deny a request for jurisdictional discovery where the request rests on "bare allegations in the face of specific denials made by defendants." *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 562 (9th Cir. 1995). Lucky must show a "reasonable probability" that the jurisdictional outcome would change with discovery. *Laub v. U.S. Dept. of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003).

Lucky has not made the required showing. At most, the requested materials might establish the presence of some Arizona readers and show that Parsons reviewed the Article. But Arizona accessibility and viewership, without more, are insufficient to show aiming. Nor has Lucky established a reasonable probability that communications between Wilhelm and Parsons concerning the Article would describe anything more than a publisher's practice of accepting or declining submissions and coordinating the posting of a piece, rather than the right to control Wilhelm's activities. *Williams*, 851 F.3d at 1024-25.

## II. The Wartburg Watch's Motion to Dismiss

### A. **The Parties' Arguments**

The Moving Defendants argue that Parsons's Rule 12(b)(2) and 12(b)(6) arguments "are applicable to the Wartburg Watch, warranting dismissal on the same grounds." (Doc. 44 at 11.) They also argue that, in any event, "the Wartburg Watch is a website, not a juridical person" capable of being sued, and "should be dismissed on that basis alone." (*Id.*)

In response, Lucky contends that because the Wartburg Watch "answered this action's original complaint without ever raising personal jurisdiction as a defense," any such objection is waived. (Doc. 47 at 3, 19.) Lucky further argues that "[t]he Wartburg Watch did not preserve its capacity defense either" because the facts provided for the first time in the pending motion to dismiss—"that the Wartburg Watch is not incorporated, is

not a partnership, has no members or employees, generates no revenue"—are "exactly the kind of facts" contemplated by Rule 9(a)(2), but the Wartburg Watch failed to include them in its original answer "nearly a year ago." (*Id.* at 19-20.) Lucky also "quarrels with [the Moving Defendants'] attempt to use . . . in one direction only" the argument that the Wartburg Watch exists only as Parsons's blog. (*Id.* at 20.) According to Lucky, "[i]f the blog is Parsons and Parsons is the blog, then every editorial act attributed to the Wartburg Watch is her act." (*Id.*)

In reply, the Moving Defendants argue that Lucky "himself concedes" that the Wartburg Watch is "not capable of being sued. (Doc. 50 at 10.) The Moving Defendants further contend that because "something that lacks capacity to be sued also lacks capacity to participate," "[c]ourts have declined to find that a defendant" can waive the defense of lack of capacity. (*Id.*) At any rate, the Moving Defendants contend that Lucky's arguments regarding earlier pleadings are irrelevant because "the FAC supersedes the old [c]omplaint." (*Id.* at 11.) As for personal jurisdiction, the Moving Defendants acknowledge that "the specific procedural posture at issue here is an unsettled question in the Ninth Circuit" but contend that "the Ninth Circuit has held that a party has the option to file a new answer after a new complaint" and it "follows that it can also file a motion to dismiss in lieu of that" answer. (*Id.*) According to the Moving Defendants, "[i]t would create an absurd result if this Court were to dismiss the claims against Parsons again but allow claims against a website to continue purely on the technicality of the website having answered a complaint that was dismissed," because "[Lucky] has acknowledged that Parsons and the website are one in the same." (*Id.*)

B. **Analysis**

1. Personal Jurisdiction

The Wartburg Watch did not move to dismiss the original complaint for lack of personal jurisdiction under Rule 12(b)(2). Instead, the Wartburg Watch filed an answer, and the answer also did not assert lack of personal jurisdiction as a defense—instead, it stated simply that the Wartburg Watch "denies the allegations of paragraph seven of the

Complaint." (Doc. 16 ¶ 7.) Personal jurisdiction defenses omitted from an answer are forfeited. Fed. R. Civ. P. 12(h)(1) ("A party waives any defenses listed in Rule 12(b)(2)-(5) by . . . failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading . . . ."). Absent narrow exceptions that are inapplicable here, the forfeiture remains in place even if the plaintiff subsequently files an amended complaint. *See, e.g.*, *Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1106 (9th Cir. 2000) ("A fundamental tenet of the Federal Rules of Civil Procedure is that certain defenses under Fed. R. Civ. P. 12 must be raised at the first available opportunity or, if they are not, they are forever waived."); *Daimler AG v. A-Z Wheels LLC*, 2017 WL 9854427, *2 n.1 (S.D. Cal 2017) ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to amendment of the pleading. [B]y responding to a complaint with an answer, a defendant waives the right to respond to an amended complaint via motion, at least to the extent the defenses raised in the motion were 'available' in response to the original complaint."). Thus, the Wartburg Watch is precluded under Rule 12(h)(1) from seeking to dismiss the FAC for lack of personal jurisdiction.

Although the analysis could end there, the case for forfeiture is particularly strong here because the Wartburg Watch's actions after filing its answer are inconsistent with those of a party contesting a court's exercise of jurisdiction—the Wartburg Watch participated in the formulation of the Rule 26(f) report; failed to raise any personal jurisdiction-related objections in the portion of the Rule 26(f) report requiring the parties to list "[t]he names of any parties not subject to the Court's personal jurisdiction" (Doc. 22 at 2); joined in a request for a court-ordered settlement conference before a magistrate judge (*id.* at 3); and participated in the resulting settlement conference, which was unsuccessful (Doc. 35).

2. Capacity

"Except when required to show that the court has jurisdiction, a pleading need not allege: (A) a party's capacity to sue or be sued; (B) a party's authority to sue or be sued in

a representative capacity; or (C) the legal existence of an organized association of persons that is made a party." Fed. R. Civ. P. 9(a). Instead, to raise the issue of capacity, "a party must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." Fed. R. Civ. P. 9(a)(2).

The Wartburg Watch did not, in its original answer, affirmatively assert the defense of lack of capacity, nor did it offer specific denials on the issue of capacity. Lucky's original complaint alleged that the Wartburg Watch "is an unincorporated association that conducts and online presence and, more specifically, a 'blog.'" (Doc. 1 ¶ 2.) In its answer to the original complaint, the Wartburg Watch stated simply that it "denies the allegations of paragraph two of the Complaint." (Doc. 16 at 1.) Nevertheless, the Wartburg Watch now asserts in its motion to dismiss that it is "a website, not a juridical person," and "[i]t is not incorporated, is not a partnership, has no members or employees, generates no revenue, and exists only as Parsons's blog." (Doc. 44 at 11.)

A defendant's belief that it lacks capacity "can be analogized to an affirmative defense" that, contrary to the Moving Defendants' argument, can be "treated as waived if not asserted by motion or responsive pleading." *De Saracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 878 (9th Cir. 2000) (citations omitted). In *De Saracho*, the Ninth Circuit upheld a finding of waiver where "Defendants did not raise the authority to sue issue until one week before the trial was scheduled to begin." *Id.* Similarly, in *Summers v. Interstate Tractor & Equipment Co.,* 466 F.2d 42 (9th Cir. 1972), the Ninth Circuit found waiver where the defendant "did not raise the defense of plaintiff's capacity to sue by specific negative averment in its answer, or at any time until appeal." *Id.* at 49-50.

"As a pleading rule, Federal Rule of Civil Procedure 9(a) clearly contemplates that the defendant can raise a capacity issue in its answer or in an amended answer as may be allowed. When a party's lack of capacity is shown on the face of the plaintiff's complaint, the defendant can also challenge capacity via a pre-answer motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." Gensler, *supra*, § 9.3. *See also Klebanow v. N.Y. Produce Exchange*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack

of capacity is not expressly mentioned in rule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint."). Thus, although the Wartburg Watch did not assert lack of capacity in its original answer, the Court understands the Wartburg Watch's capacity argument as incorporated into its motion to dismiss under Rule 12(b)(6).

Although the Ninth Circuit has not addressed whether a defendant who has already answered a complaint may file a Rule 12(b)(6) motion to dismiss an *amended* complaint, several district courts in this circuit have concluded that a defendant may assert a Rule 12(b)(6) defense only to the extent the defense challenges "new matter" in the amended complaint. *See, e.g.*, *Power Probe Grp, Inc. v. Innova Electronics Corp.*, 670 F. Supp. 3d 1143, 1147 (D. Nev. 2023) ("Interpreting FRCP Rule 12(b) to permit a defendant to submit a post-answer motion to dismiss an amended complaint attacking claims raised in the original complaint would render the 12(b) restriction on post-answer motions meaningless."); *Best Fresh LLC v. Vantaggio Farming Corp.*, 2022 WL 4112231, *10 (S.D. Cal. 2022) ("Essentially, post-answer motions to dismiss can only be heard to the extent the arguments set forth were not previously available to the moving party."). Under the logic of those cases, the Wartburg Watch would be barred from moving to dismiss the FAC under Rule 12(b)(6) based on a lack-of-capacity theory because the Wartburg Watch could have moved to dismiss the original complaint on that ground.[9]

Even so, district courts in the Ninth Circuit may treat untimely or successive Rule 12(b)(6) motions as motions for judgment on the pleadings under Rule 12(c). *Aldabe v. Aldabe,* 616 F.2d 1089, 1093 (9th Cir. 1980) ("Because it is only after the pleadings are closed that the motion for judgment on the pleadings is authorized, Rule 12(h)(2) should be read as allowing a motion for judgment on the pleadings, raising the defense of failure to state a claim, even after an answer has been filed."). *Cf. Dickman v. N.Y. Life. Ins. Co.*, 2026 WL 2267480, *7 (D. Ariz. 2026) ("Although Defendants' presentation of these

[9] Count One of the FAC is the same defamation claim as in the original complaint, and none of the new factual allegations in the FAC address the Wartburg Watch's capacity to be sued.

arguments violates the letter of Rule 12(g)(2), the Ninth Circuit has held that this provision should be read in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1. . . . Thus, as a matter of practical wisdom, the Ninth Circuit has specified that, as a reviewing court, it should generally be forgiving of the district court's ruling on the merits of a late-filed Rule 12(b)(6) motion.") (cleaned up). Thus, the Court analyzes the Wartburg Watch's capacity argument as a motion for judgment on the pleadings under Rule 12(c). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (cleaned up).

The FAC includes the affirmative allegation that "[t]he Wartburg Watch is an unincorporated association." (Doc. 39 ¶ 5.) The Court looks to Arizona law to determine whether an unincorporated association has the capacity to be sued. Fed. R. Civ. P. 17(b)(3) (capacity to be sued, for parties other than individuals or corporations, is determined by the law of the state where the court is located, with exceptions not relevant here). In Arizona, "unless authorized by an Arizona statute," unincorporated associations "[have] no capacity to sue." *Associated Students of the Univ. of Ariz. v. Ariz. Bd. Of Regents*, 584 P.2d 564, 566 (Ariz. Ct. App. 1978). *See also id.* at 566-67 ("It was a maxim of the common law that an unincorporated association could not be a party to litigation. . . . . If the State of Arizona wishes to grant unincorporated associations legal status, it may do so by the appropriate legislation. However, until the legislative intent to do so is clearly manifested, the privilege must be denied."). Thus, the Wartburg Watch lacks the capacity to be sued under Arizona law and must be dismissed from this action. *See also Handwerker v. Smith*, 2007 WL 9724809, *2 (D. Ariz. 2007) ("[T]he Scottsdale City Court is merely an operational department of the City of Scottsdale. Without a separate corporate existence, it has no capacity to sue or be sued. Thus, the motion to dismiss will be granted as to Scottsdale City Court."); *Karsten Mfg. Corp. v. U.S. Golf Ass'n*, 728 F. Supp. 1429, 1436-37 (D. Ariz. 1990) (agreeing with defendants "that, as an unincorporated association, the

R & A lacks the capacity to be sued on the state law claims set forth in Counts III–VII" and noting that "Arizona follows the well-established rule that, absent statutory authority, an unincorporated association . . . cannot sue or be sued in the organization's own name") (cleaned up). *Cf. Wine & Canvas Development, LLC v. Weisser*, 886 F. Supp. 2d 930, 942 (S.D. Ind. 2012) ("Based on common sense and Indiana precedent, it is obvious to this Court that a website alone is not an entity capable of being sued.").

III. <u>Transfer</u>

In his response to the motion to dismiss, Lucky contends that "[i]f the Court concludes that it lacks personal jurisdiction over Parsons," the Court should "transfer the claims against her and The Wartburg Watch—severing them if necessary—to the United State District Court for the Eastern District of North Carolina, where Parsons resides, rather than dismissing them." (Doc. 47 at 21.)

"Transfer is appropriate under [28 U.S.C.] § 1631 if three conditions are met: (1) the transferring court lacks jurisdiction; (2) the transferee court could have exercised jurisdiction at the time the action was filed; and (3) the transfer is in the interest of justice." *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir. 2001). Courts have interpreted § 1631 to authorize transfer based both on a lack of personal jurisdiction and on a lack of subject-matter jurisdiction. *See, e.g.*, *Fed. Home Loan Bank of Bos. v. Moody's Corp.*, 821 F.3d 102, 114 (1st Cir. 2016); *Tisher v. Boeing Co.*, 2026 WL 982883, *12 (D. Or. 2026) ("There is a circuit split with respect to whether a lack of personal jurisdiction supports transfer under § 1631. Courts in the Ninth Circuit and in this District generally have concluded that it does."). The decision whether to transfer under § 1631 is discretionary. *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990).

Lucky argues all three conditions for transfer are met and the "third is close to dispositive" because the statute of limitations for defamation in both Arizona and North Carolina is one year and Lucky filed this action two days before the one-year anniversary of the publication of the Article. (Doc. 47 at 21.) So, Lucky asserts, "[a] dismissal entered now would extinguish the claim rather than redirect it." (*Id.*) In reply, the Moving

Defendants assert that transfer would not be "in the interest of justice" because Lucky "failed to state a claim against Parsons[,] and the Wartburg Watch cannot be sued. It is not in the interest of justice to transfer a matter that is frivolous." (Doc. 50 at 12.)

As an initial matter, there is no need to conduct a § 1631 transfer analysis as to the Wartburg Watch because, as discussed above, Lucky's claims against the Wartburg Watch have been dismissed pursuant to Rule 12(c), not based on a lack of personal jurisdiction. As for Parsons, because the Court has again concluded it lacks personal jurisdiction over her, the first condition under § 1631 is satisfied. As for the second condition under § 1631, this action could have been brought in the United States District Court for the Eastern District of North Carolina, where Parsons resides and publishes the blog. That is, the Eastern District of North Carolina could have exercised both personal and subject-matter jurisdiction over this action at the time it was filed.

As for the third condition under § 1631, "[n]o fixed list of factors guides the court's discretion in deciding whether a § 1631 transfer is in the interest of justice." *Fisher v. United States*, 2009 WL 2187552, *2 (W.D. Wash. 2009). For example, "[a] court can consider whether the plaintiff was aware of the jurisdictional issue when he filed his action, and may also consider whether the plaintiff is *pro se*. It does not serve the interest of justice to transfer an action that was brought for an improper purpose or one that is weak on the merits. The court may also consider the plaintiff's good or bad faith in bringing the action, and any prejudice that would accrue to the plaintiff if the case were not transferred." *Id.* (cleaned up).

Having weighed the relevant considerations, the Court concludes in its discretion that a transfer of Lucky's claim against Parsons to the Eastern District of North Carolina would not be in the interest of justice. Although Lucky is now proceeding *pro se*, he was represented by counsel at the time he filed both the original complaint (Doc. 1) and the FAC (Doc. 39). Additionally, although the Court has not had occasion to consider the merits of Lucky's defamation claim against Parsons (because it has resolved both of Parsons's motions to dismiss on jurisdictional grounds), the Court notes that Parsons has

voiced an intention to raise what appears to be a strong defense under § 230 of the Communications Decency Act. (Doc. 44 at 8-10; Doc. 50 at 8-9.) Finally, a transfer would result in overlapping, potentially duplicative litigation "in two different forums [that] would risk inconsistent results . . . . The two courts could make contrary findings and conclusions over the same facts and issues. Such an outcome would not be in the interest of justice." *Goldwater Bank NA v. Caliber Home Loans Inc.*, 2021 WL 4974102, *2 (D. Ariz. 2021).

IV. <u>Leave to Amend</u>

Lucky has not requested further leave to amend in the event of dismissal—instead, his only alternative request is for jurisdictional discovery, which has been denied for the reasons stated above.

Even if Lucky had requested further leave to amend, that request would have been denied. Lucky was already given one opportunity to amend his complaint as to personal jurisdiction over Parsons but failed to provide any new factual allegations sufficient to remedy the deficiencies identified in the Court's previous order. It would be futile to provide him with yet another opportunity to amend under these circumstances. *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."). Additionally, although Lucky is now *pro se*, he was represented by counsel in filing both his original complaint (Doc. 1) and the FAC (Doc. 39), so he is not deserving of the grace generally granted to *pro se* litigants.

Similarly, it would be futile to allow leave to amend as to the Wartburg Watch because Arizona law does not grant unincorporated associations the legal capacity to be sued, and no amendment by Lucky will change this. *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir. 2000) (leave should be granted unless the pleading "could not possibly be cured by the allegation of other facts").

…

…

Accordingly,

**IT IS ORDERED** that:

1. The motion to dismiss (Doc. 44) is **granted**. Parsons and the Wartburg Watch are dismissed as Defendants.

2. Because Wilhelm did not file an answer to the original complaint, after his motion to dismiss was denied, or to the FAC, the Court will, as a one-time courtesy, extend the response deadline. Wilhelm's deadline to respond to the FAC is extended to December 2, 2026.

Dated this 19th day of November, 2026.

Dominic W. Lanza
United States District Judge